511 So.2d 1052 (1987)
Wendy DUDLEY, Appellant
v.
The STATE of Florida, Appellee.
No. 86-269.
District Court of Appeal of Florida, Third District.
August 11, 1987.
*1053 Bennett H. Brummer, Public Defender, and Henry H. Harnage, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen., and Steven T. Scott, Asst. Atty. Gen., for appellee.
Before HUBBART and BASKIN and FERGUSON, JJ.
HUBBART, Judge.
This is an appeal from a conviction and sentence for direct criminal contempt. The contempt conviction stems from the failure of the contemner, as a pretrial custody release custodian, to produce in court, as ordered, the body of a criminal defendant for trial below on drug trafficking charges. The case raises novel and important issues concerning the authority of a trial court to enforce, through contempt proceedings, pretrial custody release orders entered in criminal cases. We conclude, based on the circumstances on this case, that the evidence adduced below was insufficient to support the instant contempt conviction, and, accordingly, we reverse.

I
The facts relevant to the instant contempt conviction are as follows. On September 12, 1985, the state attorney filed an information below charging one Kevin Patrick Brown  not a party to this appeal  with trafficking in cocaine, a serious felony in Florida carrying a minimum mandatory sentence of fifteen years imprisonment. § 893.03(2)(a), Fla. Stat. (1985). Brown had apparently been arrested about three weeks previously at the Miami International Airport in possession of approximately 400 grams of cocaine. Pretrial bail was set in the case, but Brown could not post it and, accordingly, remained in custody at the Dade County Jail. The pretrial bail was subsequently reduced by the court, but again Brown was unable to post it and remained incarcerated.
Brown reapplied to the trial court for a further reduction of his pretrial bail and for a custody release. The trial court conducted a full evidentiary hearing on this application and thereafter granted the request. Specifically, the trial court reduced Brown's pretrial bail to $150,000 and, in addition, released Brown in the custody of his cousin, Mrs. Wendy Dudley, the contemner in the instant contempt proceeding. It was made to appear at this hearing that Brown was a young unmarried Bahamian citizen who resided with his family in The Bahamas; Mrs. Dudley, on the other hand, was a resident of the United States and she lived with her husband and family at a home in Dade County, Florida. The trial court made it crystal clear to Mrs. Dudley that she was responsible for Brown's appearance *1054 at all court hearings in connection with the drug trafficking charge  that she was liable to go to jail for six months and be fined $500 if Brown failed to appear at any court hearing, including trial, in the case  and that she should "call" the state attorney's office and the court if she had "any inclination" that Brown would not appear in the case when required. Mrs. Dudley, however, was given no telephone numbers to reach the state attorney or the court either during regular business hours or on an emergency basis. The court thereafter set Monday, January 27, 1986, at 9:00 A.M. as the next court hearing in the case.
On December 26, 1985, approximately one week later, Brown posted the $150,000 bail and was released from jail in the custody of Mrs. Dudley. On Monday, January 27, 1986, at 9:00 A.M., Mrs. Dudley appeared in court at the scheduled court hearing but without Brown as ordered by the court. The trial court immediately cited Mrs. Dudley for direct criminal contempt of court based on Brown's nonappearance. The court thereafter conducted a full evidentiary hearing on the contempt citation at which time Brown's attorney, Brown's bail bondsman, Mrs. Dudley's husband, Mrs. Dudley's daughter, and Mrs. Dudley herself testified.
Brown's attorney, Phillip Carlton, Jr., testified that he got a telephone call from Mrs. Dudley at 9:30 A.M. the previous Saturday, two days prior to Brown's scheduled court appearance. Mrs. Dudley informed him that Brown had disappeared and she didn't know where he was, that she had just discovered this disappearance that morning when she awoke and found that Brown had left her house where he had been staying, and that the last she had seen him was the previous night at 10:30 P.M. just before she went to bed. She told Mr. Carlton that she had been instructed to call the judge if Brown disappeared, but said, "I don't think I can do it; it is ... Saturday." (Tr. 20). Mr. Carlton recommended that she "call the operator or go get the phone book or something" to obtain "an office chambers number" for the trial judge, David Gersten, because he felt the judge's residence number would most likely be unlisted. Mrs. Dudley agreed to do this as she had not, at that point, made an effort to contact the trial judge. Thereafter, Mr. Carlton called Brown's bail bondsman, Mr. Charles Flowers, who had already been notified by Mrs. Dudley of Brown's disappearance; he also attempted to call Brown's sister in The Bahamas, but found that the phone there had been disconnected.
Brown's bail bondsman, Charles Flowers, testified that he had been contacted by Mrs. Dudley at 7:30 A.M. on the same Saturday  two hours before Mr. Carlton had talked to Mrs. Dudley  and learned that Brown had just disappeared. Mr. Flowers gave Mrs. Dudley a phone number at which she eventually reached Mr. Carlton. He then attempted to call Brown's sister in The Bahamas, but found the phone was disconnected. He eventually, through a contact in Nassau, reached the sister's husband in The Bahamas; the husband had no idea where Brown was and said that he could not believe that Brown had skipped as it was not like Brown. Mr. Flowers then called Mrs. Dudley for more leads; Mrs. Dudley was crying on the phone and said no friends ever came around to see Brown.
Mrs. Dudley's husband, Isaac T. Dudley, testified that Brown had stayed with him and his wife at his home in Miami for approximately three weeks prior to the court hearing that day. He said he was with Brown the previous Friday night  two and a half days prior to the court hearing  until 11:30 P.M. watching television at his house. The next morning he and Mrs. Dudley discovered that Brown was gone; he told Mrs. Dudley that she had better report Brown's disappearance. Mrs. Dudley's daughter  Sheila McCady  testified that she had been at her mother's house that same Friday night until 8:00 P.M. and confirmed that Brown was there at that time.
Mrs. Dudley also testified at length at the contempt hearing. She stated that Brown had been living at her house up until two days ago  the prior Saturday *1055 morning  when she woke up to discover that Brown, who always stayed around the house, had disappeared with his belongings. She had last seen Brown, she said, the night before at 10:30 P.M. at her house watching television when she went to bed. He was not there at 7:00 A.M. the next morning when she prepared to leave the house for work; his bed, she said, had not been slept in. She then told her husband, went to her work at a convalescent home, and there made a number of telephone calls. She called Mr. Flowers and Mr. Carlton that morning and notified them of Brown's disappearance. She also gave the following testimony about her claimed efforts to notify the trial judge:
"Q. [Mr. Yedlin]: Did you speak to the bail bondsman?
A. Not right away. As soon as the secretary came, when I told her I didn't have the Judge's number  I remember he told me to call his office. So when Mr. Carlton came on, I asked him for the Judge's telephone number, anything, so he gave me the Judge's name and I called information and got the number from them for the switchboard operator at the courthouse. Nobody answered that phone.
Q. Now, by 9:30 you had already informed the bondsman?
A. And Mr. Carlton.
Q. And Mr. Carlton?
A. Yes.
Q. After you informed the bondsman and Mr. Carlton, did you work the rest of the day?
A. I tried to call the Judge again but I couldn't get across."
(Tr. 9-10.)
She further stated that she did not remember that she was to notify the state attorney's office if Brown disappeared. "All I remember," she said, "is the [j]udge say get in contact with him." She also attempted, she said, to telephone Brown's mother in the Bahamas, but found that the phone there had been disconnected; she also called other family members in The Bahamas but never got through to anyone. She was cross examined extensively by the state attorney but stood by prior testimony; she had no prior criminal record.
The defense then rested, the state presented no evidence, and the case was then argued on the merits by counsel for both the state and Mrs. Dudley. At the conclusion of the hearing, the trial judge dictated an order into the record  an order which was later reduced to writing  which found Mrs. Dudley guilty of criminal contempt. The trial judge's basis for reaching this conclusion was: (1) Mrs. Dudley had been specifically warned by the trial judge that she could go to jail if she failed to produce Brown for required court hearings, (2) Mrs. Dudley undertook the responsibility of being Brown's custodian with that warning in mind, (3) Mrs. Dudley failed to produce Brown for a required court hearing, (4) Mrs. Dudley "upon learning of [d]efendant Kevin Brown's absence ... did not fulfill her [c]ourt ordered obligation to contact:
[a] [t]he [s]tate [a]ttorney's office
[b] [t]he [c]ourt (through the [e]mergency judge)
[c] [t]he police department
[d] [t]he [i]mmigration authorities."
(R. 12-13), and (5) Mrs. Dudley's testimony at the contempt hearing was rejected because she was "not a credible witness." (R. 12). This being so, the trial court concluded its contempt order as follows:
"13. That the Custodian/Contemner is in willful violation of an order of this Court and the Custodian/Contemner had the ability to ensure that she would not be in violation of the order.
14. That this willful conduct is offensive to the orders and process of this Court.
15. That the Custodian/Contemner did not make a good faith effort to contact all the above mentioned persons or entities so that the defendant could be apprehended at the earliest possible moment.
WHEREUPON THE COURT ORDERS AND ADJUDGES:

*1056 That the Custodian/Contemner be incarcerated in the Dade County Jail for 5 months and fined $500.00."
(R. 13.) This appeal follows.

II
The central contention raised on appeal by Mrs. Dudley is that the evidence adduced below was insufficient to establish that she wilfully with criminal intent disobeyed the court's pretrial custody order. She relies heavily on her exonerating testimony given at the contempt hearing that she was not at fault in failing to produce Brown at the scheduled court hearing  and that she had made all reasonable efforts to contact the proper authorities after she learned of Brown's disappearance. The state, on the other hand, argues that the evidence was more than sufficient to sustain this contempt conviction because (a) Mrs. Dudley failed to produce Brown for a court hearing, as required, after having been previously warned that she could go to jail if she failed to do so, and (b) the trial court, as the finder of fact, was privileged to reject entirely Mrs. Dudley's exonerating explanation for failing to obey this order. In order to pass upon the merits of those respective legal positions, it is necessary to examine the applicable Florida law on this subject, and then apply that law to the instant case. As will be shown, we ultimately agree with Mrs. Dudley's position and reject the state's position.

A
At the outset, we should note that we, in part, write on a clean slate in this area of the law. We have been cited by the parties to no case law in Florida or anywhere else in the country  and our independent research has revealed no such case  which has ever dealt with the power of a trial court to enforce by contempt a pretrial court order releasing a criminal defendant into the custody of a third party pending court hearings and trial in the case. We think it obvious, however, that the trial court possesses the authority to enforce such orders by contempt proceedings because it has the inherent authority to enforce any of its orders by the sanction of criminal contempt.[1] Fla.R.Crim.P. 3.131(b)(iv) specifically authorizes a trial judge to place a defendant awaiting trial in a criminal case, as here, "in custody of a designated person ... agreeing to supervise him." We know of no reason why orders of this sort should be exempt from enforcement by the court's general criminal contempt power.
This being so, it is clear that the usual, well-established, general rules in Florida governing direct criminal contempt proceedings are applicable to criminal contempt proceedings instituted, as here, to enforce pretrial custody release orders. First, a criminal contempt is classically defined as an act which is calculated to embarrass, hinder, or obstruct a court in the administration of justice, or which is calculated to lessen its authority or dignity.[2]Second, criminal intent is an essential element of a criminal contempt, but such intent may, generally speaking, be inferred from disobedience of a court order, providing the court order is specific enough in its terms to admit of no reasonable ambiguity or confusion.[3]Third, a defendant is presumed innocent of a criminal contempt charge and his guilt must be proven beyond a reasonable doubt before he may be convicted.[4]

*1057 B
A prima facie showing of a direct criminal contempt against a custody release custodian is, accordingly, shown upon proof that the custodian failed, as ordered, to produce the body of the criminal defendant at a scheduled court hearing. This is so because such proof establishes that the custodian violated a specific court order, and, as indicated, this is generally sufficient to establish that the party violating the court order is guilty of a criminal contempt.
It seems obvious, however, that this prima facie showing may be negated by the custodian upon a showing that he made every reasonable effort to produce the body of the defendant for the subject court hearing, but was unable to do so due to no fault of the custodian. This is so because the custodian, under these circumstances, entertains no criminal intent to violate the court's pretrial release order, and, consequently, cannot be guilty of a criminal contempt. True, it is generally no defense to a criminal contempt charge that the contemner did not intend to violate a specific court order, as criminal intent is presumed by the contemner's disobedience of the subject court order. This rule presupposes, however, that the contemner had it within his power to obey the court order, but declined to do so. If he lacked the power to comply with the court order  for example, in the case of a support order in a marriage dissolution action where the spouse lacks the financial ability to comply with the order and has not voluntarily divested himself of this ability  it is not criminal contempt for the contemner to fail to comply with the order because he is not at fault in such non-compliance.[5]
It follows, therefore, that the pretrial release custodian has the burden of going forward with the evidence to raise the above-stated no-fault defense. He has, of course, an absolute right to remain silent and may not be compelled to testify or raise such a defense. Should he fail to do so, however, it is plain that his failure to produce the body of the criminal defendant without reasonable explanation is sufficient to sustain a conviction for criminal contempt against him  much as a defendant's unexplained possession of recently stolen property is sufficient to sustain a criminal conviction against him for theft of the subject property.[6] On the other hand, once the custodian chooses to go forward with the evidence and raises a no-fault defense, the state has the ultimate burden of proof to establish beyond a reasonable doubt that the custodian had a criminal intent to violate the custody order in question in that he was in some measure at fault for his failure to produce the body of the criminal defendant as required. This is so because the burden of proving guilt beyond reasonable doubt in a criminal contempt proceeding  including the element of criminal intent  never shifts and is always on the state.

C
We come now to the very heart of the applicable law in this case, namely, the legal impact of the custodian's exonerating explanation as to why she was unable to produce the body of the defendant for a court hearing. It is well settled in Florida that a defendant's otherwise reasonable, unrebutted, and unimpeached testimony in a criminal case must be accepted by a trier of fact and  if such testimony is entirely exonerating, the trial court is obligated to enter a judgment of acquittal for the defendant on the crime charged.[7] On the *1058 other hand, where the defendant's exonerating testimony (a) is not reasonable on its face, or (b) is contradicted by other evidence in the case, or (c) is otherwise impeached, the trier of fact is privileged to reject such testimony and convict the defendant of the crime charged, providing, of course, there is otherwise sufficient evidence of guilt.[8]

III
Turning to the instant case, we have no trouble in concluding that the state initially established a prima facie case of criminal contempt against Mrs. Dudley by its undisputed showing below that (1) the defendant Brown was placed in the custody of Mrs. Dudley by the trial court with the specific direction (a) that Mrs. Dudley produce Brown for all required court hearings and trial in the case, upon pain of Mrs. Dudley going to jail if she failed to do so, and (2) Mrs. Dudley thereafter failed to produce Brown for a scheduled court hearing in the case on January 27, 1986. If no other evidence had been adduced below, we would have no hesitation in affirming the contempt conviction under review. Considerable evidence, however, was adduced below by Mrs. Dudley and it is the legal effect of this evidence which is basically in dispute in this case.

A
Mrs. Dudley testified in some detail below that the criminal defendant in her custody  Kevin Brown  had been continuously living with her and her family at her house in Miami for approximately three weeks after Brown's release, that without warning he suddenly disappeared one night two days before the scheduled court hearing, that she had last seen Brown at her house on a Friday night and when she awoke the next morning he was gone, and that she immediately thereafter notified Brown's bail bondsman and attorney. She further testified that she unsuccessfully attempted to call the trial judge at his chambers in the courthouse, but, since it was a weekend, she understandably was unable to reach him. Brown's attorney had no way of contacting the trial judge either, as he surmised that the judge most likely had an unlisted home phone number. Mrs. Dudley further testified that she telephoned various members of Brown's family in the Bahamas, but could not reach any of them as the family's phone had been disconnected. Her testimony was, in turn, corroborated by the testimony of four other witnesses  including Brown's attorney and bail bondsman. Surely these efforts, as detailed above, were more than sufficient to exonerate Mrs. Dudley of any fault in failing to produce Brown, as ordered, at the scheduled court hearing in question.
The trial court, however, in its order of contempt faulted Mrs. Dudley for failing "to fulfill her court-ordered obligation to contact
[a] the [s]tate [a]ttorney's [o]ffice;
[b] the [c]ourt (through the [e]mergency [j]udge);
[c] the police [d]epartment;
[d] the [i]mmigration authorities."
(R. 12-13.)
The fatal flaw in this reasoning is that Mrs. Dudley was never informed that she had to notify "the police," or "the immigration authorities" in the event Brown disappeared. Nor was she advised how to contact "the court through the emergency judge" or the "state attorney's office" on weekends, when she says Brown disappeared. Indeed, Mr. Carlton, Brown's attorney, had no idea how to contact the trial judge on weekends when Mrs. Dudley called him  except through the judge's office which was closed. Moreover, Mrs. Dudley was never advised she was to contact "the emergency judge" at all; she did call the trial judge's office, she said, but *1059 understandably could not get through as the office was closed for the weekend. Admittedly, Mrs. Dudley forgot to contact the state attorney's office, but she could not have reached this office, in any event, on the weekend without an emergency telephone number which she was never given.
We deal here, then, with a last minute disappearance of a criminal defendant for which the release custodian was in no way at fault  followed by reasonable unsuccessful efforts by the custodian to locate the defendant and to notify the court. Under these circumstances, there is a clear showing that the custodian, Mrs. Dudley, had no criminal intent to violate the custody order in question and was in no way at fault for failing to produce the criminal defendant, Brown, for the scheduled court hearing.

B
The trial court, however, as an additional basis for its decision, totally rejected Mrs. Dudley's exonerating testimony below on the ground that she was not a "credible witness." The state urges, in essence, that this rejection forms an independent basis for upholding the instant contempt conviction. We cannot agree. It is clear on this record, beyond any hope of successful contradiction, that Mrs. Dudley's testimony was reasonable on its face, was entirely unrebutted by any other evidence in the case, and was otherwise unimpeached; indeed, the state makes no serious contention to the contrary. Moreover, the testimony was entirely corroborated by four other witnesses who testified in the cause  including two independent witnesses: Brown's attorney, Mr. Carlton and Brown's bail bondsman, Mr. Flowers. Under these circumstances, it is plain that the trial court was not privileged to arbitrarily reject Mrs. Dudley's exonerating testimony, but was compelled to accept it and adjudge Mrs. Dudley not guilty of criminal contempt under the established law of this state.
The final judgment of conviction and sentence for criminal contempt under review is, therefore, reversed and the cause is remanded to the trial court with directions to discharge Mrs. Dudley from the cause.
Reversed and remanded.
BASKIN, J., concurs.
FERGUSON, Judge (concurring).
I concur in the result, but I am inclined to advance the theory a step further. An obligation to produce a defendant is a contractual obligation under which the surety guarantees the State that the defendant will appear at subsequent proceedings. Accredited Sur. & Casualty Co. v. State ex rel. Hillsborough County, 383 So.2d 308 (Fla. 2d DCA 1980). The liability of a surety may not be extended beyond the terms of his contract. State ex. rel. Dade County v. All Florida Sur. Co., 59 So.2d 849 (Fla. 1952); Midland Ins. Co. v. State, 354 So.2d 961 (Fla. 3d DCA 1978). There is no reason for a different rule to apply simply because the surety is a relative rather than a bondsman.
When a custody release is granted in lieu of bail the contract terms should be spelled out on the record. The consequences of an ordinary breach should not constitute a crime but should be governed by contract law. A practical difficulty is that custody releases are most often granted to indigent defendants whose relatives accepting custodial responsibility are often in the same dire economic status as the defendant. That difficulty has resulted in a gradual obliteration of the distinction between civil and criminal law in custody release cases.
The question, in the final analysis, is whether the fact of indigency can justify the court imposing criminal rather than civil remedies and substituting imprisonment for property forfeiture. I think not. Imprisonment of an indigent custodian for failure to produce a defendant pursuant to a contractual undertaking is an act of questionable constitutional validity.
My analysis admittedly could have dampened the court's enthusiasm for the popular custody release, to the detriment of defendants and correction facility administrators. But where a defendant simply absconds without the aid or assistance of the custodian *1060 there is no basis for presuming criminal complicity. Absent proof by the State, which excludes every reasonable doubt of innocence, that the surety's conduct amounted to independent criminality there can never be any criminal consequences for failure to produce the defendant.
NOTES
[1] See e.g., Demetree v. State, 89 So.2d 498, 501 (Fla. 1956).
[2] See e.g., Clein v. State, 52 So.2d 117, 119 (Fla. 1950); Ex Parte Crews, 127 Fla. 381, 173 So. 275 (1937); Thomson v. State, 398 So.2d 514, 517 (Fla. 2d DCA 1981).
[3] See e.g., Florida Ventilated Awning Co. v. Dickson, 67 So.2d 218 (Fla. 1953); Linowitz v. State, 498 So.2d 1315 (Fla. 3d DCA 1986); Thomson v. State, 398 So.2d 514 (Fla. 2d DCA 1981); C.N. v. State, 433 So.2d 661, 663 (Fla. 3d DCA 1983); Ward v. State, 354 So.2d 438 (Fla. 3d DCA 1978); Kranis v. Kranis, 313 So.2d 135, 139 (Fla. 3d DCA 1975).
[4] See e.g. Pugliese v. Pugliese, 347 So.2d 422 (Fla. 1977); Demetree v. State, 89 So.2d 498, 502 (Fla. 1956); Adirim v. City of Miami, 348 So.2d 1226, 1227 (Fla. 3d DCA 1977); Martin v. State, 397 So.2d 1012, 1015 (Fla. 1st DCA), pet. for review denied, 411 So.2d 384 (Fla. 1981); Hamilton v. State, 363 So.2d 580, 581 (Fla. 3d DCA 1978), cert. denied, 374 So.2d 101 (Fla. 1979); Turner v. State, 283 So.2d 157 (Fla. 2d DCA 1973); In re S.L.T., 180 So.2d 374, 378 (Fla. 2d DCA 1965).
[5] Andrews v. Walton, 428 So.2d 663 (Fla. 1983); Faircloth v. Faircloth, 339 So.2d 650 (Fla. 1976).
[6] See e.g., Smith v. State, 394 So.2d 407 (Fla. 1980); affirming 378 So.2d 313 (Fla. 5th DCA 1980); State v. Young, 217 So.2d 567 (Fla. 1968), cert. denied, 396 U.S. 853, 90 S.Ct. 112, 24 L.Ed.2d 101 (1969).
[7] See e.g., McArthur v. State, 351 So.2d 972, 976 n. 12 (Fla. 1977); Mayo v. State, 71 So.2d 899, 903 (Fla. 1954); Holton v. State, 87 Fla. 65, 99 So. 244 (1924) (syllabus by court); Jones v. State, 466 So.2d 301 App. at 323 n. 40 (Fla. 3d DCA 1985) and cases collected (Hubbart, J., dissenting).
[8] See e.g., Williams v. State, 437 So.2d 133 (Fla. 1983), cert. denied, 466 U.S. 909, 104 S.Ct. 1690, 80 L.Ed.2d 164 (1984); Peek v. State, 395 So.2d 492 (Fla. 1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981); Francis v. State, 58 So.2d 872 (Fla. 1951); M.R. v. State, 399 So.2d 56 (Fla. 3d DCA 1981); Piantadosi v. State, 311 So.2d 742 (Fla. 3d DCA 1975); Jones v. State, 466 So.2d 301 App. at 324 n. 42 (Fla. 3d DCA 1985) and cases collected (Hubbart, J., dissenting).