PARIENTE, Justice,
dissenting.
Defendant, Timothy Brown, appeals his conviction as a principal for first-degree mur *904 der and his sentence to life in prison without parole. Because I find the evidence presented by the state insufficient to prove that defendant had the necessary conscious intent to be convicted as a principal in the first degree, I agree with defendant that the conviction should be reversed.
This case arises from the tragic death of a sheriffs deputy (the victim), who died on November 13,1990, from a gunshot wound to the head. At the time of the murder, defendant was fifteen years of age and mildly retarded with an IQ of 56. The sole evidence produced at trial linking defendant to the shooter, Keith King, was a statement given by defendant in July 1991, eight months after the crime, to the Broward County Sheriffs Office (BSO).[1] Defendant asserts, and I agree, that his July 1991 statement was insufficient to convict him as a principal in the murder.[2]
According to the July 1991 taped statement, recorded by a BSO deputy, on the evening of November 12, 1990, defendant met up with King. The two began drinking alcohol and getting high on crack (cocaine) and marijuana. Afterwards, they rode off together on defendant’s bicycle with King sitting on the handlebars. While on the bicycle, King first showed defendant a gun. Within two blocks of the Circle K convenience store, the scene of the shooting, King told defendant that he was going to kill someone. Defendant’s reaction on the tape to King’s statement was, “I called his bluff,” meaning that defendant “[didn’t] believe it.” The specific questions and answers in defendant’s taped statement concerning the subject are as follows:
Q. So you’re calling his bluff, you don’t believe it?
A. Yes, sir.
Q. Okay, you’re basically telling [King] that you believe he’s got like the nerve to do it?
A. Yes, sir.[3]
In the specific portion of the taped statement regarding the circumstances surrounding the actual shooting, defendant explained:
A. ... We get — we pulled up and saw the police so [King] said don’t go out that way. So we ride that way. I pulled up anyway, you know what I am saying, I wasn’t paying no attention around there. As I was still pulling, [King] jumped off the bicycle.... [King] told me to look up. I looked up. He said he’s got him.
[[Image here]]
Q. What does that mean to you?
A. He’s gonna kill somebody, that means—
Q. That that’s the person he is gonna Mil?
A. Yes, sir.
Q. And do you see that police officer?
A. Yes, sir.
Q. And you know that that’s who he’s directing that comment to, that that’s who he’s got, that’s who he’s gonna kill?
*905 A. Yes, sir.
[[Image here]]
A. And when [King] jumped off the bicycle, he made a limp over there to the ear, like you know how he walk, he was limping over there to the car and he fired it....
After the shot was fired, defendant “panicked.” King then jumped onto the bicycle with defendant and fired again. According to the statement, King later threw the gun in a rock pit. A murder weapon was never found.
Based solely on his taped statement, defendant was convicted of first-degree murder as a principal. No physical evidence or eyewitness testimony linked defendant to the shooting. Although fourteen witnesses testified for the state, the testimony primarily related to the circumstances of the actual shooting itself and what had caused the victim to be in the vicinity of the Circle K at 1:00 a.m., the time of the shooting.[4]
Both the actor and those who aid and abet the commission of a crime are guilty as principals in the first degree. See § 777.011, Fla.Stat. (1993); Staten v. State, 519 So.2d 622 (Fla.1988); West v. State, 585 So.2d 439 (Fla. 4th DCA 1991). The rule applicable to an aider and abettor requires proof that the accused intended to participate in the crime and performed some act which assisted in its execution. Mere knowledge that an offense is being committed and “mere presence at the scene, including driving the perpetrator to and from the scene,” is not sufficient without proof that the defendant intended to participate in the crime prior to its perpetration. Staten, 519 So.2d at 624 (citing Collins v. State, 438 So.2d 1036, 1038 (Fla. 2d DCA 1983)); see also West. On the other hand, as the supreme court observed in Staten, a getaway driver who has prior knowledge of the criminal plan and helps the perpetrator escape falls into the category of a principal in the first degree as an aider and abettor. 519 So.2d at 624.
As stated by the first district in Evans v. State, 643 So.2d 1204, 1205-06 (Fla. 1st DCA 1994), review denied, 652 So.2d 818 (Fla.1995), a case reversing a conviction for aiding and abetting based on insufficient evidence where the sole evidence also consisted of the defendant’s tape recorded statement:
To secure a conviction on an aider and abettor theory, the state must establish (1) that the defendant helped the person who actually committed the crime by doing or saying something that caused, encouraged, incited or otherwise assisted that person to commit the crime; and (2) that the defendant intended to participate in the crime. E.g., Howard v. State, 473 So.2d 841 (Fla. 1st DCA 1985). Given the evidence presented at trial, both the trial court and the jury were obliged to accept appellant’s statement as true, because it was reasonable, unrebutted and unimpeached. E.g., Dudley v. State, 511 So.2d 1052 (Fla. 3d DCA 1987). In fact, but for appellant’s statement, there was no evidence even placing appellant at the scene of the offenses.
In West, our court reversed a conviction because of the insufficiency of evidence showing the defendant’s prior intent to participate in the crime. 585 So.2d at 440. We pointed to the fact that the circumstances of the crime itself indicated a “spontaneous decision by the assailants to commit the crime.” Id. at 441. The evidence suggested that the crime was committed “on the spur of the moment without notice to” the defendants or at least “this is a reasonable inference to be drawn from the evidence presented.” Id.
The evidence of defendant’s intent to participate in this crime can only be derived circumstantially from the set of facts as contained in the statement. These facts are reasonably subject to inculpatory or exculpatory interpretation and therefore, in my opinion, are insufficient proof beyond a reason *906 able doubt on the essential element of defendant’s intent to commit this offense:
The ultimate question devolves here then as to whether a jury may be permitted to consider a single set of circumstances, which are at once susceptible of opposing reasonable hypotheses on the issue of guilt or innocence in a criminal case, and return a verdict of guilty based on their view of the more reasonable of the two. Clearly not, since it is the tendency to establish one fact to the exclusion of contrary facts which gives circumstantial evidence the force of proof in the first place; and when circumstances are reasonably susceptible of two conflicting inferences they are probative of neither. There simply would be no “proof.”
Grover v. State, 581 So.2d 1379, 1381 (Fla. 4th DCA 1991) (citations omitted).
The question in this case of whether defendant intended to participate in the crime prior to its perpetration hinges on several sentences from defendant’s taped statement. The initial statement by King that he was going to kill someone, made less than two blocks from the scene of the crime, evoked the equivocal response from defendant that he was calling King’s bluff. A reasonable inference to be drawn from this response is that defendant, a fifteen-year old with limited mental faculties who was drunk and high on drugs, initially believed that King was not serious and that King would not kill anyone. If defendant thought King’s statement was pure bravado, he could never have formulated an intent to participate in the murder. At most, defendant’s statement established his possible foreknowledge that a crime might occur, nothing more. It certainly failed to exclude the reasonable hypothesis of innocence that defendant did not believe that King would kill anyone and was only joking with defendant.
As to the issue of defendant knowingly performing some act which assisted in the execution of the crime, there is no indication that defendant understood, even after King got off the bike, that he was assisting in a plan to kill somebody, a necessary element of aiding and abetting. In fact, as defendant rode his bicycle into the Circle K parking lot, King told him, “don’t go that way,” indicating towards the victim’s vehicle; nonetheless, defendant “pulled up anyway ... [as he] wasn’t paying no attention around there.” It was only after King got off defendant’s bicycle that King told defendant, “[I] got him,” which defendant interpreted to mean that King was about to shoot the victim. I cannot accept the state’s argument that a more reasonable interpretation of defendant’s statement that he called King’s bluff was that defendant dared King to kill someone and thereby encouraged him to shoot the victim. According to the taped statement, defendant never uttered any specific words of encouragement and only became aware of the crime as it unfolded.
A reasonable inference to be drawn based on defendant’s July 1991 taped statement is that the crime was in fact committed by King on the “spur of the moment” without any prior intent of defendant to participate or knowing assistance or active encouragement by defendant. Therefore, I find defendant’s July 1991 taped statement an insufficient basis to support defendant’s conviction as an aider and abettor. Accordingly, I would reverse and remand with directions that defendant be discharged.

. An earlier statement taken on November 15, 1990, two days after the crime, was suppressed because defendant did not receive his Miranda warnings and appeared to be under the influence of narcotics at the time. In fact, investigating authorities did not continue questioning defendant at that time because of defendant's mental state. Defendant was not questioned again until eight months later, in July 1991, one month after King was arrested for the murder.

. Defendant alternatively claims that the statement of July 1991 should also have been suppressed because the statement did not show, by a preponderance of evidence, that it was voluntarily given due to defendant’s age, IQ and the psychological coercion from the November 15, 1990 statement, which had been suppressed, but which was used during the questioning in July. He also claims that he was not competent to voluntarily waive his Miranda rights as a result of his low IQ and mental status. Lastly, he claims that the fact that his legs were shackled during questioning added to the coercive aspect of the statement. I have serious doubts about the voluntariness of this statement given the totality of the circumstances. See Tennell v. State, 348 So.2d 937 (Fla. 2d DCA 1977); but see Bonifay v. State, 626 So.2d 1310 (Fla.1993).

.A psychologist testified at the suppression hearing that defendant had a "passive compliant personality" and that it would therefore be possible to "twist words and get [defendant] to agree to anything." She testified similarly at trial. The fact that defendant evidently agreed to two seemingly conflicting questions bears this out.

. Part of the defense at trial was not only that defendant did not give the statement voluntarily and that defendant was innocent of the shooting, but that the clerk at the Circle K had earlier implicated another person in the shooting. The defense also alleged that the Broward County Sheriff's Office was under great pressure to solve the murder pointing, for example, to the fact that during the early morning hours following the shooting, between 75 and 100 employees of the Broward County Sheriffs Office had been on the scene.