71 So.2d 899 (1954)
MAYO
v.
STATE.
Supreme Court of Florida. En Banc.
March 16, 1954.
Rehearing Denied May 4, 1954.
*900 Liddon, Isler & Welch, Panama City, for appellant.
Richard W. Ervin, Atty. Gen., and Reeves Bowen, Asst. Atty. Gen., for appellee.
DREW, Justice.
The appellant, Ellis Mayo, was indicted by the Bay County Grand Jury for the first-degree murder of one S.W. Coram, was tried therefor, convicted by a jury of murder in the second degree and sentenced to a thirty year term in the State Prison. From the judgment and sentence this appeal is prosecuted.
The record shows that about 4:00 P.M. on Saturday, October 6, 1951, at West Bay, Florida, the appellant and the said S.W. Coram, a local constable, engaged in an exchange of several pistol shots with the result that Coram was fatally wounded by a bullet entering midway at his left collar bone and emerging under his right arm. Both parties used 38 calibre pistols. Several witnesses saw some or all of the shooting. That Coram fired the first shot was clearly established by eyewitnesses and was not disputed. The shooting took place out of doors.
Appellant's version of the shooting was that shortly before the event, he was riding in his car in the vicinity with his brother, Jack, who was driving. They were stopped on the road by Constable Coram, who ordered Jack out of the car, searched him, and said he was going to take him to jail for driving while drunk. Appellant and Jack then voluntarily left their own car and got into Coram's car. Coram started toward town, but on the way the two brothers talked Coram into changing his mind about taking Jack to jail and Coram then turned around and returned to where appellant and Jack had left his car, stopping close to it.
At about the time he was stopping his car, Coram told appellant and his brother to stay away from the vicinity or he would lock them up, to which appellant replied they "could go any place they pleased." When Coram stopped the car he quickly opened his car door and got out. Appellant, who was sitting in the front seat with Coram, opened the door on the right in order to get out of the car and at the time observed Coram out of the car on the left side with his gun in his hand. Coram, with both doors of the car open, shot through the car at appellant, who pushed back and jumped out, simultaneously drawing his own pistol and firing at Coram. Coram went to the left rear of his car and appellant went to the front of the car and around it and saw Coram at the left rear fender. Coram whirled and fired and appellant shot back at him. Appellant then ran toward a nearby building to get better protection from Coram, his own gun being empty because it had contained only two live shells. Upon looking back, appellant saw Coram on the ground and returned to find him dead. Appellant then took Coram's gun and drove away in his own car with his brother Jack. Appellant says they left because they were afraid of Coram's boys. Appellant had on his person additional live shells which were divided between the two guns.
The appellant's version of the immediate circumstances of the shooting itself as related above, was corroborated by his brother and others and was not contradicted in any material respect, except as to the total number of shots fired, which was variously stated as being from four to eight.
As to earlier events of that same day bearing on the homicide, appellant testified that he left home about 10:00 A.M., took a cab to Panama City and other places, stopping twice to buy Vodka  half a pint and one pint. He remained with the cab driver until about 3:00 P.M., when he went to his mother's home and found his wife, his brother and his car. He took his own car and left with his brother to go to West Bay. In the car was a pistol appellant had *901 recently purchased from a soldier. To try out the gun for the first time, appellant stopped on a side road, got out of the car, and fired four times at a pine tree, after which he carried the pistol in his belt without reloading. The brother, Jack, drove because the car was new and he wanted to try it. Appellant with his brother then went to West Bay to visit a girl and upon arriving there they saw Coram at the place and drove on by because the day before Coram had warned appellant to stay away from West Bay. They later returned after seeing Coram had left, but being advised that the girl was not there they departed and shortly thereafter were stopped in the road by Coram.
Witnesses for the State testified to the following matters: that Coram was an expert with guns; that at the time of the shooting there were seen spurts of dirt behind Coram but none behind appellant; that Coram arrested appellant a week before the shooting; that on the afternoon of the shooting, appellant stopped at a juke joint, looked around and departed after saying, "The damned Constable's not here." One State witness (Ellis Scott) testified that on the afternoon of the shooting while driving along the highway he saw Coram's car parked and was flagged down by Coram so that he stopped and started walking back to Coram's car; that Coram and appellant each got out of the car and Coram said nothing but appellant said: "Boy you had better keep on going"; that at the time he did not see Coram's gun or holster but appellant held a gun in his hand pointed at no one. Appellant denied the substance of this testimony, stating Scott passed as they were turning around and at Coram's request appellant told Scott there was no trouble and to go on.
In this appeal the State contends that from the foregoing evidence the jury was entitled to infer and believe that appellant formed a grudge against Coram following his earlier arrest and purchased a gun to use on Coram if Coram should bother him again; that on the day of the shooting appellant's travels before the shooting were to locate his car primarily to obtain the gun kept therein and that when he found the car he went to West Bay in search of Coram and not to see the girl; that appellant practiced using the pistol "so as to be sure he wouldn't miss when he later saw Coram," and he then carried it in his belt "so as to have the gun ready for instant use on Coram;" that appellant "fortified his courage with Vodka," and went to West Bay searching for Coram; that while appellant and his brother were in Coram's car, appellant disarmed Coram and that either he or his brother substituted blank cartridges in the gun and, just as they returned to West Bay, appellant returned the gun to Coram and "said something by way of threat or insult which goaded Coram into firing at the appellant."
The State further argues, and we now quote from its brief:
"These facts add up to a convincing total. When an expert pistol shot fires pointblank into a car at a man sitting on the front seat, with the door beside the man closed, and neither touches the man nor the car and, after the man gets out on the ground, shoots at him again without touching him, and the last shot fired at the time the expert fell sounded peculiarly different from the preceding shots, the jury is entitled to believe that the expert's gun had been doctored by substituting blank cartridges for the live ones ordinarily carried in it.
"Appellant made sure that nobody would ever be able to examine the cartridges in Coram's gun to see whether the cartridges in it, both fired and unfired, were blank cartridges. He took Coram's gun with him when he fled the scene and his brother Jack `threw the old shells out' and put in some shells that the appellant got out of his pocket and handed to Jack. We find in the record no explanation by the appellant of why he went to the trouble to take Coram's gun off and have the shells in it removed and others inserted, and under all of the circumstances the jury was entitled to believe that it was for *902 the purpose of covering up his substitution of blank shells for live ones Coram had put in his gun. True, the appellant said that he left the scene because he was afraid of the Coram boys, but we find no claim that he took Coram's pistol through fear of anybody and we note that the only Coram boy named in the record, Lloyd Coram, was a special deputy sheriff for Jenkins' Drive-In, miles away from West Bay. So there was nothing in the appellant's testimony to stand in the way of the conclusion that he took Coram's pistol off for the purpose of trying to conceal his substitution of blank cartridges for live cartridges in said gun."
The State's argument continues:
"All of which justified the finding that the appellant deliberately planned to kill Coram; that in furtherance of the plan he worked things around to where he found himself in Coram's car, on the front seat with Coram; that he `jumped' Coram with the use of a pistol and took Coram's gun away from him; that, having recently had trouble with Coram, he didn't want to kill Coram off on the road where he would have no `self-defense' witness but, instead, chose to do it right in West Bay in the presence of witnesses, under such circumstances that these witnesses would vouch for the fact that Coram fired first; that he used a pistol to make Coram turn around and drive back to West Bay; that on the way back either the appellant or his brother Jack surreptitiously removed the live shells from Coram's gun and inserted blank shells instead; that when Coram stopped at West Bay the appellant handed Coram's gun to him and hurled some threat or insult at Coram for the purpose of causing him to start shooting at the appellant, all unaware of the fact that his gun was loaded with blank cartridges; that the appellant then mowed Coram down in feigned `self-defense', in the presence of witnesses who could and did appear in his defense and swear, truthfully, that Coram fired first.
"One of the questions which the jury had to solve was as to why the appellant ran off something like thirty yards after the last exchange of shots if he knew that Coram's gun had only blank cartridges in it. This question presented no great problem. Coram, an expert shot, having repeatedly missed the appellant at point blank range while the appellant was seated in the car, and having again missed when he shot at the appellant after the latter got out on the ground, went to fooling with his gun as though he knew something was wrong with it. Coram `stopped with his gun in his hand and brought it around like this (indicating), like he was going to do something to it;' when Coram had the gun in both hands [sic] he was `sort of like this (witness rose to demonstrate), slightly crouched'. Coram `stopped and put both hands on his gun and drawed it up kinder like that (indicating)'. By the time Coram fell, the appellant was about 30 yards away, by the old shop building. The Appellant said that he ran off because he had fired the last shot in his gun. The jury was entitled to believe that the appellant ran off after firing his last shot because Coram was handling his own gun with both hands in such fashion as to indicate that he knew something was wrong with it and because the appellant feared that Coram would succeed in putting some live cartridges in and then shoot the appellant with deadly effect. An expert shot like Coram, once he succeeded in getting his pistol loaded with live cartridges, would present a far too formidable foe to trifle with." Finally, the State concluded:
"The evidence would have justified a conviction for murder in the first degree. And when such is the case the rule is well settled that a verdict of guilty of a lower degree of unlawful homicide will not be disturbed."
*903 Summarized, then, the theory of the State to uphold the verdict and judgment appealed from is in substance that earlier in the day while in Coram's car appellant or his brother with appellant's knowledge surreptitiously substituted blank shells in Coram's pistol, and thereafter, appellant, choosing a place where there were witnesses, by insult provoked Coram into starting to shoot at appellant, who drew his pistol and deliberately shot Coram to death in the gun fire that followed. It is clear that the very foundation of the State's case is that blank shells were substituted in Coram's gun by appellant or by another with his knowledge. Unless this fact has been established by legal evidence or may be legally deduced from the legal evidence, the sentence and judgment are invalid. To put it another way, if Coram had live shells in his gun when he shot at the appellant, appellant could not lawfully be guilty of the offense for which he was convicted and sentenced.
A defendant's version of a homicide can not be ignored where there is absence of other evidence legally sufficient to contradict his explanation. In Holton v. State, 87 Fla. 65, 67, 99 So. 244, 245, the deceased was found on the side of a road with a bullet wound in his head and a pistol lying by his side under his right hand, which pistol contained an empty shell and two loaded shells. A small cloth was lying across his body near the waistline. The defendant claimed he shot deceased in self-defense after being shot at by deceased.
In reversing a conviction of second-degree murder this Court stated:
"It is urged that the fact of the finding of the cloth on the body of the deceased and the fact of the wound in the back of the head tend to show that the accused was attacked from behind, and after he fell the cloth which he used as a wrap for his pistol was taken from the pistol, the body turned over, and the cloth placed upon it; but all this is mere conjecture. The defendant's explanation was that the deceased, who was walking by the side of his mule, began the dispute, accused the defendant of stealing a whisky still, called him a liar when he denied it, and fired at him with the pistol; that the defendant replied with a shot from his shotgun, the mule whirled, jerking the deceased half around, and defendant reloaded his gun, and fired again. If that was a true account of the transaction, we do not agree with the conclusion of the jury that it was murder in the second degree. We think the evidence as a whole fails to support the verdict. See Small v. State, 20 Fla. 780.
"The circumstances relied upon by the state to contradict the defendant's story are not so conclusive of the falsity of that story as to have warranted the conviction. If they had been sufficient to overcome the defendant's story and refute it in detail, it would have left the defendant with nothing to stand on but a practical confession of murder in the first degree; but the jury evidently was not satisfied with the sufficiency of the evidence offered by the state to justify a verdict of murder in the first degree."
The holding in the above case was followed in Kelly v. State, 99 Fla. 387, 388, 126 So. 366, where we reversed a conviction of second-degree murder, after defendant testified to facts showing the pistol death was accidental and there was "no substantial evidence that in any way contradicted the testimony of the accused." Likewise in Metrie v. State, 98 Fla. 1228, 1229, 125 So. 352, 353, we reversed a conviction of second-degree murder arising from an altercation on a public street where there was "no conflict in the testimony, and the version of the beginning of the difficulty and the infliction of the wounds resulting in the death of the deceased as told by the accused as a witness in his own behalf is uncontradicted," the defendant being the only witness as to the beginning of the fracas and the infliction of fatal wounds. Again, in Jenkins v. State, 120 Fla. 26, 161 So. 840, we reversed a first-degree murder conviction where the defendant's version *904 of the killing was not contradicted. There we said, "the evidence of the premeditated design ought to be supported by something more than guess work and suspicion, especially where the account of the homicide, as given by the accused, indicates a slaying in mutual combat under circumstances not making out a case of premeditation * *."
When circumstantial evidence is relied upon to convict a person charged with a crime, the evidence must not only be consistent with the defendant's guilt but must also be inconsistent with any reasonable hypothesis of his innocence. Head v. State, Fla. 1952, 62 So.2d 41; Bellamy v. State, 96 Fla. 808, 119 So. 137. And evidence which leaves one with "nothing stronger than a suspicion" that the defendant committed the crime is not sufficient to sustain a conviction. Frank v. State, 121 Fla. 53, 57, 163 So. 223, 224.
Circumstantial evidence is never sufficient to support a conviction where, after there is assumed all to be proved which the evidence tends to prove, another hypothesis still may be true, because it is the actual exclusion of each other hypothesis which clothes mere circumstances with the force of proof. Thus evidence leaving uncertain which of several hypothesis may be true, or establishing only a probability favoring one hypothesis rather than another, cannot be equal to proof of guilt, no matter how strong the probability may be. Whetston v. State, 31 Fla. 240, 12 So. 661. In the Whetston case we reversed a conviction for the burning of a building in the nighttime, based primarily upon described footprints and defendant's absence from home at the time of the crime. We stated the circumstances were not conclusive and noted that, "witnesses had it in their power to make an actual test of the correspondence of the tracks by comparison or measurement, but this they did not do, * * *." Whetston v. State, 31 Fla. 240, 254, 12 So. 661, 665.
We now turn to the question of whether, considered in the light of the foregoing, the record before us legally supports the verdict and judgment from which this appeal is taken.
The facts relied upon by the State to support the blank shell theory, briefly, are: (1) Appellant's arrest a week before the shooting; (2) appellant's prior purchase of a gun and on the day of shooting, his "target practice"; (3) appellant's search for his car in which was contained the gun, and his later inquiry for Coram; (4) the incident prior to the shooting related by State witness Scott; (5) the fact that Coram missed in his efforts to shoot appellant, together with testimony of absence of spurts in the sand and peculiar sound of one gun; (6) appellant's taking of Coram's pistol after the shooting.
In order to support the State's theory of the homicide from these facts at least the following several inferences must be drawn; (1) Well before the shooting, appellant formed a grudge against Coram and planned his death; (2) in forming the plan, appellant knew the calibre of Coram's pistol and obtained blank shells that would fit; (3) appellant knew that Coram was of a type who at a mere verbal insult would before witnesses start shooting at appellant; (4) prior to the shooting and unknown to Coram, the appellant or his brother, with appellant's knowledge, placed available blank shells in Coram's pistol; (5) at the time of the shooting Coram's pistol contained blank shells and appellant knew that it did.
To hold that such inferences may be legally drawn from the known facts would tax the mind of the most credulous. One would have to indulge in the presumption that appellant was possessed of supernatural powers of prophecy or mesmerism or both.
We conclude that the blank shells theory of the State finds no legal support in the record. It is no more than speculation and guesswork. The evidence in the record and the lawful inferences which may be drawn from it are wholly insufficient to sustain the judgment appealed from.
*905 The motion for a new trial should have been granted.
Reversed.
THOMAS, SEBRING, HOBSON and MATHEWS, JJ., concur.
ROBERTS, C.J., and TERRELL, J., dissent.