581 So.2d 887 (1991)
Bradley P. SCOTT, Appellant,
v.
STATE of Florida, Appellee.
No. 72091.
Supreme Court of Florida.
May 30, 1991.
Rehearing Denied July 26, 1991.
Dennis J. Rehak, Fort Myers, for appellant.
Robert A. Butterworth, Atty. Gen., and Davis G. Anderson, Jr., Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Bradley P. Scott appeals his conviction for first-degree murder and his resulting death sentence. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We find that we must reverse and vacate the conviction and sentence because the seven-year, seven-month delay in the prosecution of this cause constituted a violation of due process and because the circumstantial evidence was insufficient to support the conviction.
*888 The relevant facts of this case are as follows. On Thursday, October 12, 1978, a twelve-year-old girl, Linda Pikuritz, left her home in Charlotte County at around 3:45 p.m., wearing blue jeans, a yellow T-shirt, red and white tennis shoes, and a shell necklace. That afternoon several witnesses who knew the girl saw her on her bicycle around her neighborhood and at the local "Li'l General" convenience store, where she bought a package of bubble gum. She did not return home that day, and the police were called at 9:00 p.m.
A body which appeared to be that of a young female was discovered at the scene of a fire at approximately 11:57 p.m. on that same day, October 12. At the scene police officers found a shell necklace, a leather visor, a pair of underpants, a red and white tennis shoe, and a package of bubble gum. Linda Pikuritz's name was written on the shoe, her sister-in-law's name was on the visor, and the underpants were similar to those which she wore. The medical examiner concluded that the body was consistent with that of a girl approximately twelve years old, that smoke and soot inhalation had caused the victim's death, that she was unconscious at the time of death, and that there was no evidence of trauma or injuries not caused by the fire. Further, there was no evidence of a sexual assault. On October 13, the day after the murder, Linda Pikuritz's bicycle was found hidden in some bushes next to a road near the Li'l General store.
The Charlotte County Sheriff's office originally investigated this murder in 1978-79. The appellant, Bradley P. Scott, was a primary subject of the investigation, but he had produced an alibi for the night of the murder that included details of where he and his girlfriend had been that evening. The state attorney declined to seek an indictment against Scott at that time, principally because of the alibi. An indictment was eventually filed against Scott in 1986, seven years and seven months after the murder. Scott was tried before a jury in 1988. Prior to the trial, the court heard and denied Scott's pretrial motion to dismiss the indictment, which was based on the assertion that he was prejudiced by the delay.
The state's entire case against Scott was based upon circumstantial evidence. One witness saw Scott on the evening of Linda Pikuritz's disappearance in his car speaking in a nonthreatening manner to a young girl on a bicycle. However, his identification of Scott took place almost seven years after his observation. Another witness testified that she had seen the victim at the Li'l General store with Scott during the early evening of the day of the murder, that they were both standing between the open car door and the car, and that their conversation appeared to be friendly. She did not identify Scott until seven years after the murder, even though she knew him, she had been introduced to him and had seen him on more than one occasion prior to the murder, and she had seen and recognized him at a restaurant less than an hour before she went to the Li'l General store. Also, a classmate and friend of the victim testified that she, another girl, and the victim met Scott at the Li'l General store on a number of occasions during the month preceding the murder; that he sometimes bought them beer and smoked marijuana with them; and that she was supposed to meet the victim, who was bringing marijuana, at the Li'l General store on October 12, but she did not go. The other friend confirmed these facts, adding that the girls had flirted with other older men, that other men bought them beer, and that Phil Drake was the girls' source for marijuana. Another witness testified that she had seen a girl resembling the victim talking to a man in a car resembling Scott's 100 yards down the street from the witness's home on the day of the murder. Her description of the car changed during the five years following the murder, but in 1984 she did pick out Scott's car as being similar to the one she saw. The place at which she saw the conversation between the girl and the man in the car was in close proximity to where the victim's bicycle was found the day after the murder.
In addition, Scott's employer and his employer's wife testified concerning statements *889 that he made shortly after the day of the murder. Scott's employer's wife testified that Scott called her between 7:30 and 7:45 a.m. on the day after the murder to ask if he could pick up his pay check. She testified that, during the telephone conversation, Scott asked her if she had "heard about the little girl that had been murdered by [her] house." According to her testimony, she asked Scott "how he had heard such a thing," and he told her that "he had been stopped at a road block the night before." On cross-examination, she admitted having previously told a police investigator that Scott's statements were related to her by her neighbor, from whom Scott had picked up his check. Scott's employer testified that his neighbor, from whom Scott picked up the check, had told him that Scott had mentioned the murder of a little girl. He also stated that during a conversation with Scott on the Monday following the murder, Scott had told him that he was stopped by a police roadblock on the way to pick up his check. The employer testified that he and another employee had then driven with Scott to the point where Scott had said he was stopped by the police, but the other employee's testimony contradicted this assertion. The state presented evidence that no police roadblock had been set up at the location identified by the employer. In a statement to police seven years after the incident, but two years before trial, the employer had not remembered Scott's having taken him to the site of the roadblock. Also, cross-examination revealed several inconsistencies between the employer's testimony at trial and his earlier statements.
Finally, the state presented physical evidence, consisting of hair samples and a seashell, which were obtained from Scott's car one year after the murder. The vehicle was obtained from a used car dealer, who had bought the vehicle and had kept it on his lot for four months. Investigators obtained the hair samples from vacuum sweepings of the car after it was retrieved from the used car lot. No hair samples had been taken from the deceased victim. However, five years after the murder, the victim's mother gave the police a wool ski cap which had belonged to the victim. An expert testified that a hair from the car sweepings was indistinguishable from hairs retrieved from the wool cap and that, in his opinion, they were from the same person. The expert acknowledged on cross-examination that positive identification of a person from a hair sample is not possible. He also testified that an ideal sampling for comparison was "20 to 15 hairs." In this instance, the expert had only two hairs to do the comparison. In addition, the expert testified that he had compared all of the sweepings from the car to textile fibers that came from the victim's clothing and that the results of these comparisons had been negative.
The other item of physical evidence was a small seashell, or "dove" shell, which was found underneath the rear seat of Scott's car during the same search that produced the hair samples. The state's expert witness testified that the one dove shell could have fit into the broken shell necklace found at the scene of the murder, but he did not know if the necklace's monofilament line had been stretched. He also opined that the broken ends of the monofilament line were probably once joined and that they were broken, not cut. An importer of such necklaces testified that hundreds of thousands of such necklaces had been imported into this country by 1978 and that his main customer was a shell factory in nearby Fort Myers. Scott's mother testified for the defense that she had transported shells on many occasions in Scott's car, explaining that one of her hobbies was collecting and working with shells. She testified that she had transported shells, including dove shells, in cigar boxes and other containers in the back seat of Scott's car and that, on numerous occasions, these shells had spilled and fallen underneath the back seat.
At the conclusion of the state's presentation of evidence, Scott moved for a judgment of acquittal, contending that the state's case was circumstantial and failed to make a prima facie showing of guilt. The trial judge, in denying the motion, said:

*890 And the Jury could take the view of this evidence in my opinion, that every reasonable hypothesis of innocence has been excluded, if they believe that the hair found in the car was that of Linda Pikuritz. And if they believe that the shell found in the car is the shell that came from that particular necklace that she wore the day she died.
Scott renewed this motion at the conclusion of his case, and the trial judge again denied the motion.
We find that, in considering the issues in this cause, we must also consider the evidence that was presented to the court before trial on Scott's motion to dismiss the indictment because of prejudicial delay. The record of that hearing reflects that investigative reports and statements taken from witnesses during 1978 and 1979 were lost and were unavailable; reports of polygraph examinations of witnesses made at the time were no longer available; records reflecting the results of fingerprint analysis were no longer available; the report of the original detective assigned to the case and the report of the first officer on the scene were lost and were not available; the report of the evidence technician in this case, made in October of 1978 and identifying the evidence collected, was missing; numerous reports prepared by another police officer who participated in the investigation were not available; and a report concerning a potential suspect who had allegedly confessed was lost. In addition, evidence associated with other cases was intermingled with the Pikuritz evidence and some evidence known to have been in the Pikuritz evidence file was lost.
The sheriff of Collier County in 1978 interviewed and hypnotized two witnesses and made a tape of those hypnosis sessions; that tape was lost and one of the witnesses had died. The former sheriff testified that he was aware of the alibi given by Scott and his girlfriend and that, during the time that he was responsible for the investigation, the alibi was checked out, and the case was submitted to the state attorney for prosecution. Also, the investigator who worked on the case at the time stated that he believed that he or someone else had verified Scott's girlfriend's October 12 work records from Sambo's Restaurant and that, when he gave the case to his successor, the alibi was intact. He also testified that an employee of Sambo's Restaurant was asked in 1985 to produce work records reflecting the dates and times that Scott's girlfriend worked in October, 1978, and that the entire month of October was missing from Sambo's records, although the month preceding the date in question and the month following the date in question were available and present in Sambo's files. The chief investigating officer stated that the case had been presented to the state attorney for consideration and prosecution but that the state attorney refused to seek an indictment because of "a problem with the alibi." The trial judge denied Scott's motion to dismiss.
At the conclusion of the guilt phase of the trial, the jury found Scott guilty of first-degree murder and, after a sentencing hearing, recommended the death penalty. The judge imposed the death penalty, finding no mitigating factors and the following four aggravating factors: (1) that the murder was especially heinous, atrocious, or cruel; (2) that the murder was committed while Scott was engaged in the commission of a kidnapping; (3) that the murder was committed to permit Scott to avoid lawful arrest; and (4) that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
Scott raises seven issues concerning the guilt phase of his trial, specifically: (1) that the court erred in excluding the testimony of a witness who had been told by his cellmate that the cellmate had been present when Phillip Drake committed this murder; (2) that the court erred in commenting on the evidence on numerous occasions; (3) that the court erred in excluding testimony that the witness Lou Kelly had been hypnotized and that, during hypnosis, he recalled evidence which was favorable to Scott; (4) that the court erred in denying Scott's motion to dismiss based upon preindictment delay; (5) that the court erred in denying Scott's motion for judgment of acquittal on *891 the grounds that the circumstantial evidence was insufficient to support a finding of guilt and that the state failed to establish a corpus delicti; (6) that section 921.141, Florida Statutes (1979), is unconstitutional; and (7) that the court erred in excusing a juror for cause.
It is only necessary that we discuss ground (4), in which Scott claims prejudice for a seven-and-one-half-year delay in the filing of the indictment, and ground (5), in which he claims that the circumstantial evidence in this case was insufficient to convict him. These claims are interrelated.
We recently adopted, in Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988), the legal principles applicable to claims of prejudicial delay in the filing of an indictment. We expressly approved the test applied by the First District Court of Appeal in Howell v. State, 418 So.2d 1164 (Fla. 1st DCA 1982), in which it adopted principles to be applied in addressing this type of claim, as set forth in United States v. Townley, 665 F.2d 579 (5th Cir.), cert. denied, 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982). This is a due process claim under the fourteenth amendment rather than a speedy trial claim under the sixth amendment. In Townley, the United States Court of Appeals for the Fifth Circuit, stated:
Thus, in evaluating an asserted due process violation based on pre-indictment delay, [United States v.] Lovasco [431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977)] and [United States v.] Marion [404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971)] require us "to consider both the reasons for the delay and the prejudice to the accused." United States v. West, 568 F.2d 365, 367 (5th Cir.1978). Further, the accused bears the burden of proving the prejudice and, if the threshold requirement of proof of actual prejudice is not met, the inquiry ends there. Id. Once actual prejudice is shown, it is necessary to engage "in a sensitive balancing of the government's need for an investigative delay ... against the prejudice asserted by the defendant." United States v. Brand, 556 F.2d 1312, 1317 n. 7 (5th Cir.1977). The inquiry turns on "whether the prosecution's actions violated `fundamental conceptions of justice' or the community's sense of fair play and decency." United States v. Shaw, 555 F.2d 1295, 1299 (5th Cir.1977). "Inherent in the adoption of a balancing process is the notion that particular reasons are to be weighed against the particular prejudice suffered on a case-by-case basis." United States v. King, 593 F.2d 269, 272 n. 3 (7th Cir.1979).
Id. 665 F.2d at 581-82. We approved this test in Rogers, stating:
When a defendant asserts a due process violation based on preindictment delay, he bears the initial burden of showing actual prejudice... . If the defendant meets this initial burden, the court then must balance the demonstrable reasons for delay against the gravity of the particular prejudice on a case-by-case basis. The outcome turns on whether the delay violates the fundamental conception of justice, decency and fair play embodied in the Bill of Rights and fourteenth amendment. See Townley, 665 F.2d at 581-82.
Rogers, 511 So.2d at 531 (citation omitted).
We must first address whether Scott has shown in this record that actual prejudice resulted to him from the seven-year, seven-month delay. Scott claims that he had an alibi for the evening of October 12, 1978, during the time period that the victim was killed. Specifically, he claims that he was with his girlfriend on that evening and that they had gone to the Sarasota Mall and purchased a suede jacket for her from Foxmoor Casuals. He alleges that his girlfriend's work records from Sambo's Restaurant would have indicated that she did not work on that evening and that records from Foxmoor Casuals would have proven the sale of the coat on that evening. However, at the time of trial, records were no longer available from Foxmoor Casuals for purchases on October 12, 1978, and, for some unexplained reason, Sambo's employee records for the month of October, 1978, were missing. An investigator testified *892 that, in 1985, Foxmoor Casuals' employees could not recall the transaction that Scott described and that they doubted that such a transaction ever took place. Scott also claims that his girlfriend's memory, which was critical to his defense, had faded during the intervening years. In 1979 she was pretty sure that October 12 was the night they had gone to the Sarasota Mall, but in 1985, when her deposition was taken, and in 1987, just before trial, she was not sure what night it was that she and Scott went to purchase the coat at Foxmoor Casuals. In addition, the written investigation records and reports concerning the alibi were missing from the investigative file. The unrefuted testimony of the first investigating officers in 1978-79 indicated that the alibi had been checked out at that time and that, when they turned over the case to their successors, the alibi was, according to one officer, intact. Important also is the unrefuted fact that the state attorney declined to prosecute this case in 1979 because of this alibi.
Further, Scott asserts that he was denied the opportunity to present evidence that someone else could have killed the victim. He asserts that a witness had stated that she observed the car of Phillip Drake at a particular location in close proximity to where the victim was found. It was unrefuted that Drake was a suspect and was the supplier of the marijuana for the victim and her girlfriends. The witness, Irene Rasmussen, died during the interim between the murder and the indictment, and, consequently, was unavailable to testify. Another witness, who also was interviewed concerning Drake's car and its location on the night of the murder, was also deceased at the time of the filing of the indictment. Also, as previously noted, other investigative reports and some evidence from the initial investigation were lost.
Finally, delay in performing the hair analysis and questionable analysis methods raise serious questions concerning the reliability of this hair comparison evidence. First, it is important to recognize that hair comparisons do not constitute a basis for positive personal identification. See Cox v. State, 555 So.2d 352 (Fla. 1989); Horstman v. State, 530 So.2d 368 (Fla.2d DCA), review denied, 539 So.2d 476 (Fla. 1988); Jackson v. State, 511 So.2d 1047 (Fla.2d DCA 1987). As the expert testimony in this record indicates, a hair comparison cannot positively identify an individual because hairs from two different people may have precisely the same characteristics. In this case, there was a five-year delay in making the hair comparison. For some unexplained reason, the initial investigators did not obtain hair samples from the victim's body, although such samples were obtainable. The two hairs which the expert considered to be the victim's hairs for purposes of the comparison were obtained five years after the murder from a stocking cap that the victim's mother testified belonged to her daughter. These hairs were compared to hairs obtained from sweepings of Scott's car that were obtained more than a year after the murder and after the car had been sold and had been kept on a used car lot for four months. As previously noted, one hair from the car matched the hairs from the cap. However, the expert testified that the ideal sampling for comparison was "20 to 15 hairs." In this instance, the expert had only two hairs to do the comparison. In addition, the expert testified that he had compared all of the sweepings from the car to textile fibers that came from the victim's clothing and that the results of these comparisons had been negative.
We find that the first prong of the Townley test has been met. Scott has established in this record that there was actual prejudice to him brought about by the seven-year, seven-month delay in the prosecution of this action. The record establishes that Scott is no longer able to corroborate his alibi that initially was checked out by law enforcement officials; that he was unable to present certain witnesses in his defense because the witnesses had died in the interim; that investigative reports, statements, and evidence that may have been helpful to Scott were lost as a result of the delay and because of changes in law enforcement personnel and administrations; and, finally, that the reliability of the hair comparison evidence was adversely *893 affected by the delay and the manner in which the comparison was made. The second prong of the Townley test requires us to balance the government's need for an investigative delay against the actual prejudice to the defendant. This record shows absolutely no need for any investigative delay in the prosecution of this case. How this case was investigated raises many questions. Further, it is clear that the delay in this instance provided the prosecution with a tactical advantage. Applying the Townley test, we find a due process deprivation under the unique circumstances of this case.
As previously noted in this opinion, the trial judge denied the motion for judgment of acquittal because the circumstantial evidence was not inconsistent with any reasonable hypothesis of innocence. In doing so, he relied heavily on the hair comparison evidence and the shell found in Scott's car. We find the hair comparison evidence not sufficiently persuasive under the circumstances of this case. This evidence is even less persuasive than the hair comparisons that were rejected as circumstantial evidence in Horstman and Jackson. With regard to the shell testimony, also relied on by the trial judge, we find that there is unrefuted evidence in this record that these types of shells were carried for other purposes in this car, and, consequently, one cannot conclude that the presence of that shell was inconsistent with any reasonable hypothesis of innocence.
As we have said before, circumstantial evidence "must be of a conclusive nature and tendency, leading on the whole to a reasonable and moral certainty that the accused and no one else committed the offense charged." Hall v. State, 90 Fla. 719, 720, 107 So. 246, 247 (1925). Since the state's case against Scott was based entirely upon circumstantial evidence, such evidence must be not only consistent with Scott's guilt but also inconsistent with any reasonable hypothesis of innocence. Davis v. State, 90 So.2d 629 (Fla. 1956). See also Cox; Duest v. State, 462 So.2d 446 (Fla. 1985); McArthur v. State, 351 So.2d 972 (Fla. 1977). That test has not been met in this case. This Court is unable to correct the problems resulting from the manner in which three different law enforcement administrations conducted the investigation of this murder. We find that the circumstantial evidence presented by the prosecution could only create a suspicion that Scott committed this murder. Suspicions cannot be a basis for a criminal conviction. Our law requires proof beyond a reasonable doubt and a fair trial for a defendant.
In summary, we find that the unjustified seven-year, seven-month delay in the prosecution of this cause violates the due process clause of the fourteenth amendment and that the state has not been able to show that the circumstantial evidence in this cause is not only consistent with the defendant's guilt but also inconsistent with any reasonable hypothesis of innocence. Accordingly, we have no choice but to reverse Bradley P. Scott's conviction, vacate his death sentence, and remand this cause to the trial court with directions to enter an order of acquittal.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD, BARKETT, GRIMES and KOGAN, JJ., concur.