764 So.2d 612 (1999)
Joseph Angelo TERRANOVA, Appellant,
v.
STATE of Florida, Appellee.
No. 96-04983.
District Court of Appeal of Florida, Second District.
October 29, 1999.
Rehearing Denied December 15, 1999.
*613 James Marion Moorman, Public Defender, and Cynthia J. Dodge, Assistant Public Defender, Bartow for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Stephen D. Ake, Assistant Attorney General, Tampa, for Appellee.
QUINCE, PEGGY A., Associate Judge.
Joseph Angelo Terranova (Terranova) appeals his convictions for first-degree murder and burglary. We reverse because the State's evidence fails to demonstrate first-degree murder and burglary beyond a reasonable doubt.[1]
Terranova was convicted of the murders of his wife, Brenda Valentino (Valentino), and her boyfriend, Michael Emerine (Emerine). Terranova and Valentino had been married for six years. He was a cabinetmaker in the Port Charlotte area. Emerine and his roommate, Donald Anstett (Anstett), also lived in Port Charlotte and were friends with Terranova and Valentino. Emerine and Anstett moved to Tampa in 1994, and in the spring of 1995, they acquired a third roommate, Daniel Carter (Carter). In late March or early April of 1995, Emerine disappeared for two weeks and then moved out without paying his portion of the April bills, including a telephone bill of $1,200. Emerine and Valentino moved into a trailer in the 4J's Trailer Park. Anstett and Carter were evicted from their trailer and left Tampa about the same time that the murders took place.
Anstett testified that Terranova visited Tampa regularly after Valentino began living with Emerine. Terranova asked Anstett if Valentino and Emerine were living together. On the day before the murders, Terranova told Anstett that he had sat in front of Anstett's trailer and watched Valentino and Emerine loading their car. He followed them and found out where they lived. Terranova also told Anstett that he and Valentino had an argument at the bank over the signing of some papers. Terranova said he would like to "have some fun" with the couple but thought he might get into trouble.
Terranova's mother, Adrianne Dyson, testified that she lived in Port Charlotte with her boyfriend, Tom O'Brien. She said that in April 1995 Terranova was undergoing physical therapy for injuries sustained in an automobile accident. On April 12, 1995, Terranova came to her home and slept after his physical therapy. He left her home between 6:30 p.m. and 7:00 p.m., but returned around 10:00 p.m. to retrieve his medication. He left again between *614 10:30 p.m. and 11:00 p.m. Eva Creek, a patron at Charlie's Pub in Port Charlotte, testified that she saw Terranova in the pub around 6:00 p.m. and 7:00 p.m. on April 12. Creek said she left around 8:00 p.m. and Terranova left before her. Kenneth Rottman, her former boss, also testified that he saw Terranova at Charlie's Pub on April 12. Rottman left around 7:30 p.m.; he left before Terranova. Neither Creek nor Rottman knew if Terranova went to the bar next door after he left Charlie's Pub.
Testimony was presented from two persons who lived in trailers near the decedents. Mindy Schacter, who lived next door, saw a bluish-gray, metallic car leaving her parking space around 7:00 p.m. on the evening of April 12. The driver was a man with dark brown wavy hair, which was parted down the middle. He was olive complexioned, with thin facial hair, probably a mustache and beard, and weighed 160-165 pounds. He was not overweight, could not have weighed 240 pounds, and he did not appear to be tall. Additionally, he did not wear glasses. Schacter was shown a photopak containing Terranova's picture, but she could not identify anyone. Later the same evening, around 10:30 p.m., Schacter heard popping sounds, which she thought were firecrackers. There were three or four sounds resembling pops or shots, some voices, then three or four more pops or shots. Another neighbor, Karen Davis, heard a car headed toward the victim's trailer sometime between 10:30 p.m. and 10:45 p.m. She heard something like firecrackers around 10:45 p.m. When she looked out of the window, she saw an older model, little, white station wagon pass her window heading out of the park. There was testimony that Carter owned a small, older model, white car, but the witness did not believe it was a station wagon.
The medical examiner testified that the murders occurred between 10:30 p.m. and 11:00 p.m. on April 12, 1995. Emerine was shot twice in the right side of the head from a distance of no more than two feet. Valentino received a grazing wound to the face at close range. She was then fatally shot through the right side of her head.
Four shell casings from a .380 were found in the trailer. There was an unloaded.22 caliber rifle in a corner of the bedroom, as well as a metal ammunition box containing an unloaded .22 caliber automatic handgun. Detectives found a .38 revolver in a set of ladies pajamas in the headboard in a bedroom. In the fall of 1994, Valentino bought a .380 pistol from Daniela Carey. Terranova and Raymond Pilcher, a neighbor when Terranova lived in Arcadia, did some target practicing into a tree. Ballistics tests indicated that bullets retrieved from the tree and from the victims' bodies were fired from the same gun. Terranova told the police that Valentino took several guns with her when she left, including a .25 semiautomatic, a .38 revolver, a chrome .380, a .45, and a .22 caliber rifle. A consensual search of Terranova's residence yielded some .45 caliber ammunition, a .22 rifle, and a BB gun.
On April 13, 1995, Bobby Adkins, a maintenance man at the trailer park, noticed the door of the victims' trailer was peeled up from the bottom corner. Adkins knocked on the door and windows of the trailer. After getting no answer, he called the police, and Officer Michael Peterson of the Tampa Police Department arrived. Officer Peterson, who was 6'2" and weighed 235 pounds could not fit in the approximately 20" opening of the door. He had Adkins, who weighed 175 pounds, slip through the opening, while he held the door up by the edge, and unlock the door from the inside. Terranova was described as weighing between 200 and 230 pounds, comparable in size to Officer Peterson.
Physical evidence was removed from the scene, but could not be connected to Terranova. For example, in the same bedroom with the bodies, a light switch had what looked to be a bloody print on it. The print proved to be of no value because, once black powder was put on it, the blood sample was destroyed. The police compared *615 the tire prints at the scene with the tread from Terranova's rental car but the tracks did not match. The front door of the trailer was dusted for fingerprints but none of the prints belonged to Terranova.
While many witnesses were presented, the evidence that supported the State's theory that Terranova committed the murders can be summarized as follows:[2] Some weeks prior to the murders, Terranova's wife left him and began living with Emerine. Terranova went to great lengths to determine where they were living and lied to the police by saying he did not know where the victims lived. On at least two occasions prior to the murders, Terranova made statements that could be taken as threats against the decedents. On the day before the murders, Terranova went to the bank with his wife, and they got into a heated argument. The bullets that were removed from the bodies of the victims matched bullets that were shot from a .38 caliber gun that Terranova owned at some point. A portion of the alibi testimony offered by Terranova's mother and her boyfriend was contradicted by other witnesses. Although this evidence suggests Terranova had a motive and possibly an opportunity to kill the victims, it falls far short of the kind of evidence needed to support first-degree murder.
Our courts have long held that a conviction based on circumstantial evidence cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. See State v. Law, 559 So.2d 187 (Fla.1989), and M.P.W. v. State, 702 So.2d 591 (Fla. 2d DCA 1997). While the question of whether the circumstantial evidence is inconsistent with any reasonable inference is generally a question of fact for the jury, the jury's determination must be supported by competent, substantial evidence. See Long v. State, 689 So.2d 1055 (Fla.1997). Evidence that creates nothing more than a strong suspicion that a defendant committed the crime is not sufficient to support a conviction. See Scott v. State, 581 So.2d 887 (Fla.1991). Terranova's hypothesis of innocence was simply he did not commit these murders. The evidence offered by the State is insufficient to point to only Terranova as the perpetrator of these crimes.
In this case, not only is Terranova's alibi testimony concerning his whereabouts at 10:00 p.m. unimpeached,[3] but the physical evidence contradicts the State's case. The physical evidence recovered at the scene failed to implicate Terranovanone of the fingerprints recovered matched Terranova's, nor did the tire tracks match Terranova's rental car. Moreover, Terranova had an alibia witness placed Terranova in the town of Port Charlotte at approximately the time the murders were being committed. Additionally, the evidence shows that the door to the victims' trailer was bent in such a fashion that the officer who first arrived on the scene, who weighs 235 pounds and stands 6 feet 2 inches, could not enter the trailer. Since the door was locked from the inside, the only manner of egress was the bent aluminum door. Terranova's large frame (between 200-230 lbs) would prevent him from exiting the murder scene in this fashion. The State also failed to rebut Terranova's testimony that Valentino took the murder weapon with her when they separated.
Because the evidence fails to rebut Terranova's reasonable hypothesis of innocence, the trial court erred in failing to grant Terranova a judgment of acquittal. See Smolka v. State, 662 So.2d 1255 (Fla. *616 5th DCA 1995); Dudley v. State, 511 So.2d 1052 (Fla. 3d DCA 1987).
We therefore reverse and direct that Terranova be discharged.
NORTHCUTT, A.C.J., and GREEN, J., Concur.
NOTES
[1] Terranova also argues that the trial court erred in excluding evidence of drug dealing between Emerine, the decedent, and Carter, which would have supported his theory that someone else murdered Emerine. Our decision on the sufficiency of the evidence has rendered this issue moot.
[2] This evidence is being viewed in the light most favorable to upholding the verdict.
[3] The State argues that the alibi testimony of Terranova's mother was substantially impeached and that the jury could have chosen not to believe her statement. However, the portion of her testimony indicating Terranova was at home at 10:30 p.m. was not impeached. There was contradictory evidence concerning Terranova's whereabouts around 6:30 p.m. Persons at the bar said Terranova was there around that time, and Terranova's mother said he was at home near that time.