752 So.2d 673 (2000)
James D. PORTER, Appellant,
v.
STATE of Florida, Appellee.
No. 2D98-3251.
District Court of Appeal of Florida, Second District.
February 4, 2000.
Rehearing Denied March 8, 2000.
*674 Richard G. Bartmon of Law Offices of Bartmon & Bartmon, P.A., Boca Raton, for Appellant.
Robert A. Butterworth, Attorney General, Tallahassee and Ann Pfeiffer Howe, Assistant Attorney General, Tampa, for Appellee.
CAMPBELL, Acting Chief Judge.
Appellant, James D. Porter, challenges his conviction and sentence for first degree murder on the sole ground that the trial judge erred in failing to grant a motion for judgment of acquittal based on a lack of evidence to sustain a conviction. We agree that the evidence fails to support appellant's conviction and reverse.
Appellant was convicted after his fourth trial for the premeditated first degree murder of his live-in girlfriend, Eve Houghton. Appellant's first two trials ended in hung juries, the third ended in a mistrial, and the fourth resulted in his conviction.
Eve Houghton was shot in the head with a .22 caliber bullet as she sat in a car (belonging to Jamie Blankenburg) with a female friend, Laurie Carr, during a birthday party outside Junior DeLeon's trailer in Bartow. The time of death was stipulated to have been 1:02 a.m. on October 24, 1993. There was testimony that shortly before the shooting, Ms. Houghton was on Jamie Blankenburg's lap in the front passenger seat of his car and they were "hugging a lot." Ms. Carr was supposedly in the driver's seat. Shortly after Blankenburg left the car to get a beer refill, witnesses testified a shot was heard and Ms. Carr ran hysterically from the driver's side, screaming, "[h]e shot her."
No one witnessed the shooting itself, only the fact that Ms. Houghton was struck and killed by a bullet and fell over in the front seat of the car in which she was seated. The bullet entered her head through her right eyebrow in a slightly upward and left direction. The theory of the State was that appellant shot Ms. Houghton with a .22 rifle from a hiding place somewhere outside of and in the vicinity of the car in which she was seated. No one placed appellant at the scene of the shooting at the time of the shooting, although he had had a brief conversation with Ms. Houghton and an altercation with Ms. Carr at the party at DeLeon's trailer several hours prior to Ms. Houghton's death. He was asked to and did leave the party at that time, and no one saw him at the scene of the shooting thereafter. As he was leaving, he reportedly made a remark such as, "[i]f I can't have her, no one can" and/or "I'll be back."
Earlier in the evening, at approximately 9:30 p.m. on October 23, 1993, appellant and Ms. Houghton had an argument on the street in the vicinity of the Driftwood Inn in Bartow. Ms. Houghton sometimes worked at the Driftwood Inn, and appellant was a frequent and well-known patron. During their argument, Bartow Police Officer Ellis came upon the couple. Ms. Houghton advised Ellis that she had just ended her relationship with appellant and "had nothing more to say," although appellant wished to keep talking. Officer Ellis advised appellant and Ms. Houghton to separate and discuss their situation *675 some other time, but not to resolve it "outside on the road."
Appellant then got in his car and left. Ms. Houghton went to the Driftwood Inn, and shortly left with Ms. Carr for the party at DeLeon's trailer. It normally took about eight minutes to drive the 5.2 miles from the Driftwood Inn to DeLeon's trailer.
The bartender that night at the Driftwood Inn, Gail Walton, testified without contradiction that appellant came back to the Driftwood Inn at about 10:30 p.m. on October 23, 1993 and did not leave again except for a few minutes at a time. She also testified that there were two clocks in the bar and that both were kept fifteen minutes fast to assure that the bar closed by 2:00 a.m.
Mary Lou Moyer, the owner of the Driftwood Inn, corroborated the clocks' settings. Ms. Moyer also testified without contradiction that on the evening of the shooting she and Mary Ann Howard had been at the Play Pen, a bar in Mulberry. They testified that they left the Play Pen between 12:20 and 12:45 a.m. for the twenty-minute drive to the Driftwood. Ms. Moyer testified it could have been as late as 1:05 or 1:10 a.m. when they arrived at the Driftwood. When they arrived, appellant was at the Driftwood shooting pool. Ms. Howard corroborated Ms. Moyer and further testified that she observed a Driftwood clock at 1:30 a.m. and that at that time, she and Ms. Moyer had been at the Driftwood for ten to fifteen minutes. After Ms. Houghton was shot at DeLeon's trailer, Sgt. Robert Parnell contacted appellant by telephone at the Driftwood in an effort to determine the victim's identity. Officer Ellis testified that at 2:18 a.m., he was instructed to go to the Driftwood and detain appellant for Polk County Sheriffs Office deputies. Officer Ellis arrived at the Driftwood at 2:54 a.m., and appellant, Ms. Moyer, Ms. Walton and Ms. Howard were present.
When the scene of the shooting was processed for evidence by law enforcement officers, nothing of evidentiary value was found. A metal detector located no shell casings, and there was nothing to indicate the direction from which, or the place from where, the fatal bullet was fired. No evidence was found to indicate anyone's presence in, behind, or close to a row of bushes that was directly in front of the car in which Ms. Houghton was shot. Witnesses believed that the passenger side window of the car was open at the time of the shooting. There was no gunshot damage to the windshield or windows of the car.
Sgt. Parnell testified that he went to the Driftwood to speak to appellant after he was detained by Officer Ellis and informed appellant that Ms. Houghton had been killed. According to both Parnell and Ellis, appellant became upset and cried. Appellant consented to a search of his home and car and agreed to accompany Parnell to a law enforcement facility for an interview. Appellant repeatedly told Parnell that he had argued with Ms. Houghton, told her he was not going to DeLeon's party, went anyway, saw her in a car with another man, got angry and left the party. No evidence was presented that contradicts appellant's story. Law enforcement officers testified that during appellant's interview with them, he admitted owning a 30/30 rifle, a 12-gauge shotgun, some pistols, a compound bow and a .22 caliber rifle that he kept in his bedroom closet. Appellant's interview was not tape-recorded. At trial, appellant denied owning any pistols or a 30/30 rifle, and none were found in the search of his home. He testified that he owned a 20-gauge, not a 12-gauge shotgun, and a 20-gauge was found in his home.
The morning after the shooting, officers searched appellant's home in Bartow where he and Ms. Houghton had been living. During the search, a .22 caliber Marlin-Glenfield Model 70 semi-automatic rifle and separate clip with ten cartridges in it was found in appellant's attic. A box with thirty-eight rounds of .22 caliber ammunition *676 was found on a shelf in appellant's bedroom closet.
There was no effort made to take fingerprints off of the rifle or clip. During his testimony at trial, appellant denied knowing how the rifle got in his attic, testifying that he had left it in his closet. Ms. Houghton's mother, Nancy Barnes and sister, Elaine Foster, both testified as defense witnesses. Ms. Barnes testified that during the week before her death, Ms. Houghton had told her, Ms. Houghton's stepfather and her sister, Elaine Foster, that she, Ms. Houghton, had "hid one of [appellant's] guns to teach him a lesson." Ms. Foster testified that Ms. Houghton, on a later occasion, told her that she (Ms. Houghton) had put the gun in the attic so that children could not get access to it to "teach [appellant] a lesson" about leaving guns within children's reach. Ms. Foster also testified that Ms. Houghton identified the gun as one appellant used to shoot a diseased puppy. Another witness testified that appellant used "a long gun" such as a rifle to shoot the puppy. Appellant testified he used the Marlin .22 to shoot the puppy.
The evidence concerning the rifle, clip, and box of .22 caliber shells is crucial to the State's case. The ballistics tests made with the rifle and comparisons with the bullet that killed Ms. Houghton and metallurgical test comparisons made of that bullet and bullets from the clip and box of shells are the State's only attempt at a direct evidentiary link between appellant and the shooting of Ms. Houghton. We conclude that that attempted link fails because the various comparison tests and the expert testimony concerning them lack the necessary degree of scientific certainty to lead to any reasonably indisputable conclusions.
The expert testimony in regard to the bullet comparisons made from the test firing of appellant's rifle and the bullet fragment retrieved from Ms. Houghton's body was particularly inconclusive. The particular characteristic of appellant's rifle is that it "utilize 16 grooves with a right-hand twist." Ballistics expert Terry LaVoy testified as follows:
Q: Do you have an idea how many different types of firearms utilize 16 grooves with a right-hand twist with regard to .22 caliber ammunition?
A: Without actually checking the literature, although I have looked at the literature, I would say there's probably six or eight manufacturers at the most that utilize .22 caliber long rifle caliber 16 lands and grooves with a right-hand twist.
Q: When you put the two test bullets under the comparison microscope after having fired them in this case, were there sufficient individual characteristics with regard to the two test-fired bullets that if you got a bullet of sufficient quality you could identify it to this particular gun?
A: I do not recall whether there were sufficient individual characteristics from test to test at this point in time.
Q: When you examined the bullet, I think you called it a fragment, the bullet that wasor projectile, let's use that wordthe projectile that was taken from Eve Houghton, were you able to determine whether it, in fact, was fired from the firearm that was submitted?
A: I was not.
On cross-examination, Mr. LaVoy testified as follows:
Q: Mr. LaVoy
A: Yes sir.
Q: when you are making a ballistic bullet comparison, there are three conclusions you can come to, are there not?
A: That is correct.
Q: Is one conclusion a positive identification that the bullet thatyour known bullet that you fire from the piece is identical with the unknown bullet that is brought to you?
A: That is correct.

*677 Q: Is the second a positive exclusion that it could not have been fired from this piece?
A: That is also correct, yes sir.
Q: And is the conclusion that you arrived at in this case that it's consistent with?
A: That is correct, yes sir.
Q: All right, sir. Would it be equally would it be equally correct to say it is inconsistent with a positive identification?
A: Certainly it is not a positive identification, so, therefore, I would say it's inconsistent with a positive identification.
Q: Would be inconsistent with a positive identification?
A: Yes sir.
Clearly, this evidence obtained from test results of appellant's rifle is inconclusive and not of sufficient substance to support his conviction.
We next turn to the only remaining evidence offered to directly connect appellant with Ms. Houghton's murderthe metallurgical tests made of bullets from the clip and box of shells retrieved from appellant's home and the fragment of the bullet retrieved from Ms. Houghton's body.
FBI agent Ernest Peele testified as an expert in bullet comparison analysis. Agent Peele analyzed thirteen of the thirty-eight bullets found in the box of ammunition and five of the ten cartridges found in the rifle clip and compared their metallurgical content and similarity with the bullet fragment removed from Ms. Houghton's body. Since Agent Peele's testimony is so crucial to the State's burden to connect appellant with Ms. Houghton's murder, we set it forth in substantial detail:
Q: What conclusion, if any, were you able to come to with regard to whether you believe this bullet represented as being from Ms. Houghton was part of the same box of bullets that are found that was in the box that I showed you, I think it's State's Exhibit 55?
A: Well, the composition of Q1, again, the bullet from the victim, is the same as the composition of three bullets from the magazine, and that magazine had ten in it. We sampled five. We took in this case more even than a representative sample. We took half of them to sample. And of those five, three had the same composition, had the same composition as Q1. Out of the 38 in the box, we sampled 13, and from those 13, four bullets had the same composition as the three in the magazine and the one in the victim.
So all of those have exactly the same composition. And based on what we've seen in the past, what you'd expect that to say is that's what happens when you analyze bullets from the same box of cartridges. Does it necessarily have to be only that same box? Certainly there's another reasonable situation, and that would be the same manufacturer, the same type, that was packaged on the same day. In other words, two boxes that were made together. That would be the reasonableness. That they are just purely random? It certainly is a possibility, but not a reasonable one by any means, because I could spend my entire career just looking for two bullets at random that matched and possibly would never find it. Or likely would never find it. Excuse me.
* * * *
Q: What is your opinion regarding whether the bullet taken from Ms. Houghton came from the same box of bullets that was found in Mr. Porter's house?
A: My opinion on that is that out of all the possibilities for them to have been different, they weren't; they're the same. And I'd expect from that sameness that that bullet would originate from the same source as these others. Hence, that same box is the most reasonable, *678 obviously, situation. [Emphasis supplied].
* * * *
Q: If the bullets had significantly different amounts of the six elements that you discussed, what conclusion would you as an expert draw from that analysis?
A: If they had been significantly different, then the conclusion would have been that's not what you expect from bullets that originated from the same box of cartridges.
So there basically are three opinions that arise out of this analytical work. Sameness relates two together, and the expectation is that the first place to find that would be the same box. Not necessarily the only place, but certainly the first place. If they are ever so slightly different, small differences, and you've got a group to work with, then potentially that's also within the same box, but not necessarily. If you only have two pieces, if you have Bullet A and Bullet B and you're comparing them and you find that they are slightly different, then pretty much you have nothing else to go on, you have to stop there. If you find that they are significantly different, in other words, if they differ substantially in the amounts of these elements, or particularly in the amount of antimony, then that is not what you'd expect if they were all in the same box, and that would be the conclusion drawn at that point. [Emphasis supplied].
In addition, on cross-examination, Agent Peele confirmed that the manufacturer of all of the bullets tested produced hundreds of millions of .22 caliber bullets a year that were distributed worldwide. The "box of ammunition" was apparently a partial box, and there was no evidence to prove whether the shells in the box of ammunition were originally from a single box of shells or a mixture of shells from several boxes. The evidence only showed that there were thirty-eight shells from the same manufacturer in a box. The metallurgical comparison of the various bullets was not so reasonably conclusive as to support appellant's conviction. The essence of Agent Peele's testimony is that the "sameness" of the metallurgical comparison of the bullet taken from Ms. Houghton with some of the bullets found at appellant's home creates an "expectation" that they came from the same source.
He further testified that of the several reasonable sources from which the similar bullets might be expected to have come, he opines that the "first place" you would expect would have been from the box of ammunition, but not "necessarily the only place." His opinion was similarly inconclusive when he testified that of all the possible sources for the bullet taken from Ms. Houghton "the most reasonable" was the box of ammunition. [Emphasis supplied]. That testimony necessarily indicates that there were other "reasonable" sources other than what Agent Peele described as "most" reasonable. That type of inconclusive testimony standing alone is not sufficient to sustain appellant's conviction.
As we stated in Bradford v. State, 460 So.2d 926, 931 (Fla. 2d DCA 1984):
We realize that where the only proof of guilt is circumstantial, a conviction may not be sustained no matter how strongly the evidence may suggest guilt, unless the evidence is inconsistent with any reasonable hypothesis of innocence. McArthur v. State, 351 So.2d 972, 976 n. 12 (Fla.1977); Mayo v. State, 71 So.2d 899 (Fla.1954). The accepted standard on review, however, is not whether the evidence failed to exclude every reasonable hypothesis but that of guilt, but whether there was substantial, competent evidence for a jury to so conclude. Rose v. State, 425 So.2d 521 (Fla.1982); see also Tsavaris v. State, 414 So.2d 1087 (Fla. 2d DCA 1982). We also realize that in applying this standard, the *679 version of events related by the defense must be believed if circumstances do not show that version to be false. McArthur at 976 n. 12; Mayo. Where there is other evidence legally sufficient to contradict his explanation, a defendant's version of a homicide may be ignored by the jury. See Williams v. State, 437 So.2d 133 (Fla.1983).
See also Yanez v. State, 744 So.2d 601 (Fla. 2d DCA 1999) and Terranova v. State, 24 Fla. L. Weekly D2476, ___ So.2d ___, 1999 WL 979593 (Fla. 2d DCA Oct.29, 1999).
Since the expert testimony offered by the State is in itself not preclusive of other reasonable hypotheses, and there is no other evidence to essentially contradict appellant's version of events, his conviction must fail.
Reversed with directions that appellant be discharged.
THREADGILL and SALCINES, JJ., Concur.