662 So.2d 1255 (1995)
Thomas E. SMOLKA, Appellant,
v.
STATE of Florida, Appellee.
No. 93-971.
District Court of Appeal of Florida, Fifth District.
August 9, 1995.
Rehearing Denied October 11, 1995.
Neal R. Sonnett and Miguel M. de la O, Neal R. Sonnett, P.A., Miami, and William Whipple, III, Wilmington, DE, for appellant.
Robert A. Butterworth, Attorney General, Tallahassee, and Rebecca Roark Wall, Assistant Attorney General, Daytona Beach, for appellee.
GRIFFIN, Judge.
Thomas E. Smolka ["Smolka"] appeals his conviction of first-degree murder of his wife, Betty Anne. After examining all the circumstantial evidence adduced by the State, we *1256 conclude the evidence will not support the conviction and reverse.
Smolka and Betty Anne were residents of Virginia Beach, Virginia but had become investors in the Radisson hotel in Ocala, Florida. They were visiting the Radisson in July 1991. While in Ocala, on July 10, Betty Anne ran an errand to the local Phar-Mor drugstore to purchase some light bulbs and grease pencils for the hotel. She entered the Phar-Mor at approximately 7:15 p.m. and left the store with her purchases approximately twenty minutes later. She was expected to return to the Radisson, and she and her husband were to join some friends for a show at the local comedy club. When she had not returned by midnight, Smolka called 911 to report her missing. The next day, a Radisson security guard searching for Betty Anne found her rented minivan parked inconspicuously facing the highway in a Pizza Hut parking lot located off of S.R. 200. The vehicle showed signs of firearm damage, and the middle seat and floor of the vehicle were covered with blood. On July 14, 1991, Betty Anne's body was discovered by two rollerbladers in a grassy area located near an apartment complex off Highway 27, in Marion County.
The police immediately focused on Smolka as the primary suspect in Betty Anne's murder although there was no physical evidence linking him to the crime. The State theorized that Smolka murdered her in order to collect $500,000 from two life insurance policies. While Smolka was seen at the hotel shortly before and after his wife disappeared, the State suggested that he or an accomplice may have committed the murder and then disposed of the body some hours later. Smolka emphasized the lack of physical evidence linking him to the murder and suggested that the evidence provided the alternative hypothesis of innocence that Betty Anne was killed by an unknown assailant during an attempted rape and/or robbery.

Smolka's Financial Motive:
The testimony at trial revealed that the Smolkas entered into a limited partnership agreement with James Dalton, in September 1990, to invest in a faltering Ocala hotel and to convert it into a Radisson franchise. There was no purchase price paid for the hotel; rather, the partnership assumed the first and second mortgages and all of the existing leases. Formally, the partnership was established only between Betty Anne and Dalton, who were equal, limited partners. Laurabe Corporation, which also appears to have been owned solely by Betty Anne and Dalton, served as the general partner. The record suggests that the partnership was placed in Betty Anne's name to protect against Smolka's other creditors; however, Smolka did personally guarantee the loan. In November or December 1990, Betty Anne's interest in the hotel was transferred to the "Betty Anne Smolka Family Trust" ["the Trust"], with the Smolka children as beneficiaries. Greg Flanagan, the Smolkas' Ocala attorney, was the trustee of the trust.
The testimony showed that Betty Anne took no active role in the business. Dalton managed the hotel's day-to-day operations. Smolka had promised Dalton that he would provide additional, personal capital, when needed, in order to keep the operation afloat; he was also charged with selling or leasing the "outparcels" of real estate owned by the hotel to raise capital.
By early 1991, it was evident that the resurrection of the hotel was not going as planned. Even though the partnership had anticipated a slow start, the negative cash flow was worse than expected. By the spring of 1991, the partnership was several months behind on the mortgage payments and many of their suppliers began refusing the hotel credit. Smolka began to increase his involvement in the hotel's daily operations, and this involvement led to increasing tension between Smolka and Dalton. Smolka also failed to provide much of the extra capital for the hotel that he had promised Dalton he would be contributing. The record suggests that Smolka was stalling Dalton's demands by telling him that he had some money coming from an insurance policy on a house that had burned down in North Carolina. When the partnership was unable to bring their mortgage or their franchise fees current, they began getting demand letters; *1257 by May 1991, the bank had declared their loan in default.
The testimony at trial showed that the reason Smolka was unable to provide the additional capital needed to run the hotel was because his personal finances were rapidly declining. A forensic accountant testified that Smolka had refinanced a piece of Virginia real estate for $2,000,000 in 1988, and was using that money and credit card advances to support himself and his family. The $2,000,000 had dwindled to $1,200 cash by May 1991, and Smolka was heavily in credit card debt. Smolka needed $28,000 a month to meet the debt service on the refinanced property and living expenses of his family. The $85,000 received in early 1990 from the fire insurance proceeds on the North Carolina home was spent in seventeen days, almost all of it going to creditors. By the end of May 1991, Smolka was virtually out of money.
In the summer of 1990, Smolka was approached by his life insurance agent to discuss his coverage needs. When he finally met with Smolka in March 1991, Smolka decided, after discussing several options, to increase the couple's life insurance, even though he already had a $500,000 policy on himself and a $250,000 policy on Betty Anne. An application was taken on May 24, 1991, and Smolka increased their coverage with term life insurance policies of $500,000 and $250,000 on himself and Betty Anne, respectively. This amount and type of insurance was not unusual, especially in light of the fact that the Smolkas had just had their third child, Molly. The testimony demonstrated that Smolka never initiated any of the telephone conversations with the insurance agent, but deferred to his agent's advice. The testimony also showed that, in making their applications, Smolka and Betty Anne both appeared concerned about having enough insurance to protect their children. Further, at Smolka's suggestion, Betty Anne's new policy was made payable to the "Betty Anne Smolka Family Trust", with the children as beneficiaries. Conversely, Smolka's new policy was payable equally to the trust and to Betty Anne. The policies were delivered to the Smolkas on July 2, 1991, ten days before Betty Anne was murdered.

The Decline of the Smolkas' Marital Relationship:
The testimony at trial also showed that the couple experienced a significant deterioration in their marital relationship around the time of Betty Anne's pregnancy with Molly in 1989. Family members and visitors to the couple's home noticed that the couple was arguing with an increased frequency and with increased anger. The Smolkas' arguments became filled with tension, making it uncomfortable for some family members to be around the couple. Betty Anne's sister testified that the couple's relationship grew worse and they would argue "about money and about everything." She said that after Molly arrived, the Smolkas would get into arguments that were very intense; they would avoid each other and not speak to each other. Smolka, who was described as previously unemotional, became increasingly emotional, and, during their arguments, the couple began to employ uncharacteristic profanities and their voices became filled with contempt and disgust.
One painting contractor who was hired several times to work on various Smolka houses, between 1987 and 1990, overheard the Smolkas, on several occasions, argue about the children and about money. Specifically, he remembered Smolka saying, after Betty Anne had left the room, that "he would have his way with that bitch"; "she'll be dead"; and "someday she'll be out of my life." By the fall of 1989, after another argument between the couple, the painting contractor overheard Smolka mumble, "Someday, that day's getting closer". Another painter recalled the Smolkas arguing about Molly, and Smolka stating that Molly was not planned and that he would not have anything to do with the child. On several occasions, that painter recalled Smolka stating that "one of these days, that bitch will get hers" and "I don't know how she thinks she can do me like this."

The Trip To Ocala:
The record shows that the couple planned in advance for a trip to Ocala during July 1991. Betty Anne told Jerry Lou Brown, who baby-sat Molly while the couple was in Ocala, that she was going to Ocala to sign *1258 some papers for the hotel and that she was needed at a board of directors' meeting to vote out an existing partner.
Smolka arrived in Ocala a few days prior to Betty Anne. When he was told that Betty Anne had missed her plane, Smolka became upset because he said that he had an appointment with an Ocala attorney, Greg Flanagan, that Betty Anne needed to attend. Betty Anne was able to take a later flight, still arriving in Ocala on Monday, July 8, 1991.

The Reason for the Trip to Ocala:
Greg Flanagan, the Ocala lawyer hired by the Smolkas, testified that, to his knowledge, there was no reason connected with the hotel or the trust that required Betty Anne's presence in Ocala in July 1991. Flanagan explained that after the Trust was created, Betty Anne had no interest in the partnership or the corporation, because the Trust was irrevocable, it named Flanagan as the trustee and the children were the beneficiaries. Thus, by July 1991, Betty Anne would have had neither the interest nor the authority to vote on the board of directors. Flanagan also testified that both he and Betty Anne were strawmen because Smolka was really in control of decision-making, along with Dalton.
Nonetheless, Flanagan did, in fact, have a meeting with the Smolkas on July 10, 1991. Smolka indicated to Flanagan during the meeting that he had wanted to discuss a restructuring of the partnership based upon the personal capital that he was contributing to the hotel in excess of the original terms of the partnership agreement between the Smolkas and Dalton. However, Dalton had been called out of town on a family emergency after the Smolkas had arrived in Ocala, so they instead discussed other business issues and Smolka provided him with copies of the new insurance policies.

Wednesday, July 10, 1991:
Celestino Delibero, Radisson's executive chef, observed a conversation between Betty Anne and Smolka in which Smolka asked Betty Anne to go get him some light bulbs and grease pencils at Phar-Mor because there were some bulbs out in the kitchen and other places around the hotel and because Smolka needed the pencils to work on a promotion. Delibero testified that it was not unusual for various persons at the hotel to go out and get supplies; even Dalton or Dalton's wife often ran such errands. However, the testimony also suggested that, earlier that afternoon, Smolka had already directed Raymond Plump, a hotel maintenance man, to get the light bulbs needed for the hotel. Later that day, when another maintenance man at the Radisson asked Smolka if he should go to the store to get some things for the hotel, Smolka told him no, because Betty Anne would be going to the store later. George Desautel, the sous chef at the Radisson, confirmed that Smolka told Betty Anne, at about 6 to 7 p.m., on July 10, to go and get light bulbs needed at the hotel. Desautel testified that when Betty Anne asked Smolka if there was not someone else who could run the errand, Smolka replied "no," saying "I need you to do it" or "I want you to do it."
Myrtle Smith was a Radisson patron who visited the Radisson on July 10, at about 6 p.m., to meet some friends; while there, she recalled being introduced, by Smolka, to Betty Anne. Sometime thereafter, she recalled seeing the Smolkas again and noticed that they had changed their clothes and looked as if they going out to dinner. Rose Chasko, head of Radisson's housekeeping, testified that between 6 and 7 p.m., Smolka informed her that he wanted the dining room tablecloths changed before dinner, because he had noticed they were wrinkled.
Tony Ottaiano was the bar and lounge manager at the Radisson in July 1991. On the afternoon of July 10, he arranged with Smolka to meet that evening at a local comedy club. Ottaiano testified that he called the Smolkas' room at the Radisson around 6:30 that evening, confirmed the plans with Betty Anne, and arranged to meet in the lounge at approximately 8:30 p.m. in order to attend the 9:00 show to which they had reservations. Another Radisson employee testified that she observed the Smolkas having dinner together at approximately 6:30 to 7:00 p.m. in the Radisson dining room.
It appears that Betty Anne left for the Phar-Mor thereafter because the record shows, via Phar-Mor security surveillance *1259 photographs, that Betty Anne entered the store, apparently alone, at approximately 7:16 p.m. and left the store at 7:36 p.m. The receipt for her purchases suggests that she conducted a transaction in the store at approximately 7:37 p.m. The only testimony pertaining to Smolka's whereabouts during this time period came from the housekeeper. Chasko testified that as she was trying to get the wrinkles out of the dining room tablecloths, she realized she would not get them finished before the dinner crowd was to arrive. Thus, she went to look for Smolka at about 7:30 p.m. to let him know that the cloths were still wrinkled. She said that she could not find Smolka, and at 8:30 she gave up and went back to her room. She testified that she knocked on his room door but got no response. Chasko admitted, however, that the grounds of the Radisson are substantial, that her times were estimates, that she might have just missed him in passing, or that he could have been taking a shower.
The next testimony pertaining to Smolka's whereabouts is from Ottaiano who testified that he received a call from Smolka at approximately 8:15 or 8:20 p.m. telling him that Betty Anne had not returned from shopping. Another Radisson employee was able to testify that he saw Smolka at the Radisson at about 8:20 to 8:30 p.m. Desautel was then able to place Smolka at the Radisson about 8:30, in the kitchen, with wet hair, as if Smolka had just showered.[1] He testified that this was unusual for Smolka because Smolka was usually well dressed with his hair dry and in place. Shelly Grannan, a Radisson bartender, also saw Smolka with wet hair, at about the same time. She also described it as unusual for Smolka to be seen with wet hair. She testified that she heard Smolka discuss with Ottaiano going to the comedy club that evening, and she heard them discuss the fact that Betty Anne was late.
According to Ottaiano, Smolka arrived in the lounge at 8:55 p.m. and told Ottaiano that Betty Anne was still not back. Ottaiano offered to cancel their evening plans, but Smolka said that Ottaiano should go to the comedy club, and that he would wait for Betty Anne at the Radisson; he told Ottaiano that they would come over to the comedy club together when she returned. When Smolka eventually came to the comedy club alone, Ottaiano said Smolka looked concerned because Betty Anne had still not returned. Ottaiano testified that Smolka stayed only five to ten minutes, because he was concerned and nervous. Ottaiano agreed to stay at the comedy show in the event Betty Anne showed up there, and Smolka went back to the Radisson.
Terry DeConna was a cocktail waitress at the comedy club, located across the street from the Radisson. She said that Ottaiano arrived alone at the club at approximately 8:55 p.m. Ottaiano explained that he was waiting for the Smolkas, that Betty Anne had not yet returned to the hotel, and that Smolka was at the Radisson waiting for her. DeConna testified that Smolka arrived at the comedy club at approximately 9:20 to 9:25 p.m. DeConna thought that Smolka stayed for approximately twenty to twenty-five minutes, thus leaving the club at 9:45 p.m. DeConna testified that Smolka was normally a very quiet man, but that on this evening he was unusually outgoing and friendly; she stated that Smolka made sure that people knew he was there by saying "hello" and by referring to them by name.
A few more witnesses placed Smolka at the Radisson between 9:45 and 11:00 p.m. Myrtle Smith said that she saw Smolka again at about 9:45 p.m. back at the Radisson. And, at approximately 10 p.m., Diane Guido, Radisson's catering manager, received a phone call from Smolka. Diane had previously informed Smolka that she would be going to the Gainesville airport on the morning of July 11. Smolka informed Diane that Betty Anne's flight was also the morning of the 11th, and he called her to inquire if she would mind stopping by the Radisson to pick up Betty Anne the next morning. Diane said that she would do so, and Smolka stated that Betty Anne would be in the lobby of the Radisson at 7:45 a.m. the next morning. Delibero then testified that he thought he saw *1260 Smolka in the Radisson laundry room on the night of July 10, around 11 p.m.; however, he said he was not positive that it was Smolka.
After the comedy show was over, at approximately 11:15 p.m., Ottaiano returned to the Radisson. He met Smolka coming through the kitchen. Both men were nervous and they got in Ottaiano's truck and went to look for Betty Anne. They went to the Phar-Mor where Betty Anne was supposed to have gone, but they could not find her vehicle. They searched various establishments, went back to an auxiliary parking lot at the Phar-Mor, and eventually returned to the Radisson after about forty-five minutes of searching. At that point, Ottaiano recommended that Smolka make a missing persons report to the police; however, Ottaiano stated that Wayne Linke, an ex-police officer and the director of security at the Radisson, suggested that no report could be filed if the person had not been missing for at least twenty-four hours. Linke denied making such a statement. Nonetheless, Ottaiano said that a call should be made to the police, anyway, and Smolka agreed. Smolka declined Linke's offer to use his vehicle to go search for Betty Anne.

Thursday, July 11, 1991:
Jennifer Jackson is the Ocala Police Department dispatcher who received the missing persons call from Smolka just after midnight on July 11th. Smolka informed the dispatcher that Betty Anne was supposed to just be going to Phar-Mor around 7:30 p.m. the evening before but that she had not yet returned. Smolka suggested that he thought she was driving a light-colored Dodge minivan.
Scott Fosler is a Master Police Officer at the Ocala Police Department. Fosler was dispatched to the Radisson when Smolka called in the missing person report. Fosler met with Smolka for approximately fifteen minutes and took down a report; he then issued a BOLO report. Fosler then began searching for the van at Phar-Mor and other local establishments. Fosler described Smolka's demeanor regarding his missing wife as "uncaring."
The next testimony regarding Smolka's conduct after Betty Anne's disappearance suggests that Smolka was seen by several persons walking around the Radisson premises around 3 to 4 a.m. At approximately 3 a.m., the night auditor, Mr. Chasko, informed Linke that he had just seen Smolka on the Radisson grounds walking around. Linke and Mr. Chasko had just gotten some fast food hamburgers, and they decided to call Smolka in his room to see if he wanted something to eat. Smolka declined and said that he was already in bed. When asked, Smolka denied that he had just been walking around the premises. Linke, however, testified that he saw Smolka walking around the Radisson, again, at about 4 a.m. When Mr. Chasko called Smolka's room at about 4 a.m., there was no answer. Neither Mr. Chasko nor Linke saw Smolka leave the Radisson premises.
The record next suggests that Diane Guido and her husband, Gary, stopped by the Radisson, as planned, to pick up Betty Anne around 7:45 a.m. The Radisson personnel informed them that Betty Anne had been reported missing. Thus, when the Guidos got to the airport, they inquired at the ticket counter to see if her ticket had been used. However, they were told such information was only available from security. Thus, the Guidos proceeded to get the information from security, and they found out that Betty Anne had not used her return airline ticket to Virginia.
Then, the Guidos testified that as they were leaving the airport, a little after 9:30 a.m., they were flagged down by Smolka, who had been to the airport to return his own rental car. He asked if the Guidos would wait for him to return his rental car and then give him a ride back to Ocala. The Guidos agreed.
Mary Erthal of Budget Rental Car testified that she waited on Smolka when he returned his rental car at the airport on the morning of July 11. Erthal stated that she and Smolka discussed an overcharge on the rental car rate and an overassessment of the mileage for the car rental. She also informed Smolka that somebody had called that morning looking for him, and his response was, simply, "O.K." Smolka did not *1261 mention that his wife was missing and he did not inquire if anyone had turned in her Budget Rental van. However, the record shows that the minivan had been rented from the Ocala, not the Gainesville Budget Rental Car office.
The Guidos and Smolka then returned to Ocala. On the way back to Ocala, the Guidos told Smolka that Betty Anne's ticket had not been used. Smolka said that he knew her ticket was not used because he had been there earlier and had checked. However, Susan Brown, airport security, testified that she did not recall seeing Smolka in the airport that day. Roy Brown, also with airport security, testified that he recalled the Guidos asking if Betty Anne had made her flight, but he did not recall anyone else making such an inquiry. Diane testified that Smolka did not tell her that he "checked with the ticket counter or with security" to see if the ticket had been used but, rather, had only said that he had been at the airport earlier and checked.
Diane Guido then testified that, on the way back to Ocala, Smolka kept repeating to himself that he needed to find Betty Anne. She said that he did not appear outwardly emotional and was not crying, but he was rubbing his eyes. Gary Guido remembered Smolka making the comment that "the kids were going to miss their mommy"; Guido said that there was not much feeling shown by Smolka's statements but he agreed that "everyone shows their emotions different[ly]." Both Guidos testified that they offered to look for Betty Anne's minivan on the way home to Ocala. Both also agreed that Smolka instructed them to look for a light blue minivan when, in fact, the van was gold. The Guidos returned with Smolka to Ocala, and Smolka accepted their offer to borrow their spare car to use for transportation.
By this time, it appears that the Radisson personnel had begun forming search parties to look for Betty Anne. Linke testified that he was the one that found Betty Anne's van. He got off work around 7 a.m., on July 11, and began searching with the other Radisson employees around 11 a.m. At some point later, he found the van in the Pizza Hut parking lot off of S.R. 200. Linke testified that after he spotted the van, but before he approached the vehicle, he went to the Publix next door, called the police and the Radisson. Linke testified that he then went back to the van and waited for the police to arrive. He looked through the window of the van and noticed a lot of blood on the middle seat. He said that he was unable to see the blood until he got very close, approximately one foot away from the vehicle.
The record suggests that the minivan may have been parked in the Pizza Hut parking lot some time after midnight on July 11, because Phillip Powell testified that he parked his car in the same lot, on the evening of the 10th, just a few spots away from where the van was found. Powell stated that he parked his car at 6 p.m. and picked it up between 11 p.m. and midnight and, at neither point was the van in the Pizza Hut parking lot.
Michelle Weiner, the Radisson secretary, testified that she received the phone call from Linke informing her that the minivan had been found at the Pizza Hut with blood in it; she said that Linke told her that "it didn't look good." She told Smolka and Ottaiano that the van had been found, and Ottainio drove Smolka to the scene. Linke did not recall telling Weiner either that there was a lot of blood in the minivan or that the scene did not look good.
Ottaiano and Smolka arrived on the scene within five minutes of Linke's call. Linke testified that he cautioned Smolka not to go over to the van, but Smolka kept insisting. Linke also told Ottaiano to keep Smolka away from the van, and to stay away from the van himself, so the crime scene was not contaminated. Eventually, to keep Smolka away, Linke told Smolka that there was some blood in the vehicle. Linke remembers that Smolka fell against the seat, he took a breath or "the wind went out of him" and he mumbled something like, "Why me?" Linke said, however, that he did not tell Smolka where in the van the blood was located, and that, to his knowledge, Smolka never left the passenger side of Ottaiano's vehicle and neither man ever approached the van. When the police arrived, Linke turned "the responsibility" of Smolka over to the police.
*1262 Ottaiano remembered the scene somewhat differently. He testified that when they arrived at the scene, he got out of his truck and went over to the van, which was parked two parking spots away. As he looked into the vehicle, he could see blood all over the middle seat. Ottaiano says that, at that point, they called the police to inform them that the van had been found. He and Linke then stayed on the scene to console Smolka. Ottaiano agrees that Linke told him not to let Smolka go near the van, and testified that he never observed Smolka walk over to the van and look inside, but acknowledged that he left Smolka at one point and entered the Pizza Hut. Ottaiano said, however, that Smolka did get out of the truck and walk around to stretch his legs, and he did not know whether Smolka could see the blood from the van or whether he stepped outside of the van in order to look inside. Ottaiano also agreed that he could hear other people on the scene talking about the blood in the van and heard them say that "things didn't look good". He also testified that everyone on the scene examined the middle seat, as well as every other area of the vehicle.
While at the scene, Ottaiano offered his cellular phone to Smolka, and Smolka placed a call. Smolka apparently spoke to Weiner at the front desk of the Radisson. She testified that when she asked him how he was, he responded that he wasn't doing very well because he did not get much sleep the night before. He did not mention that the van had been found with blood in it, but he did tell Weiner to send housekeeping to clean his room.
Kevin McCreight, an officer from the Ocala Police Department, testified that he was dispatched to the Pizza Hut, shortly after noon, on July 11. When he arrived, he saw Smolka sitting in the passenger side of Ottaiano's truck and he never observed him move from that spot. He testified that he saw blood in the minivan on the middle seat but was unable to see the blood until he was about one foot away. He said that he never told Smolka where in the van he had seen the blood.
Erik Petterson, a crime scene technician, testified that he overheard Smolka's conversation with an Officer Caruthers at the station house. During their conversation, Smolka expressed concern for his wife's safety. Caruthers inquired as to what made Smolka think there was something wrong with his wife, to which Smolka replied the blood found on the seat of the van. Caruthers then asked Smolka if he knew which seat of the van the blood was found on and Smolka told him "the middle seat." Caruthers asked Smolka how he knew which seat in the van the blood was found on, when all of the other witnesses had stated that Smolka never got close enough to the van to even see the middle seat. Smolka told Caruthers that he was able to see the blood from fifteen feet away. Petterson testified that he noticed Smolka's demeanor change at that point, and Smolka became very nervous and apprehensive.
Walter Alford, an investigator for the Ocala Police Department, assisted with the interviews on July 11, as well. At trial, Alford testified that he informed Smolka, at the police station, that he would probably have to submit to a gunpowder residue test. Petterson stated that Smolka was concerned about taking the test, because he had set fireworks off the week before and thought it might register a false positive. Alford said that Smolka immediately got up and went to the rest room to wash his hands, even though he had just come from the rest room moments before.
Also, at some point on July 11, after the van had been found, Smolka asked Delibero to take his briefcase home with him and to give it to Smolka's lawyer the next day in the event "something happened or went wrong." However, Delibero never did that, and he ended up giving the briefcase back to Smolka the next day. Delibero said that Smolka did not ask him to hide the case, nor did he appear to be secretive about it; Smolka merely said that it contained legal papers and insurance papers.

Friday, July 12, 1991:
Ottaiano said that by Friday, July 12, Smolka's friend, Gary Weaver, had come down from Virginia to be with Smolka. Ottaiano said that by this time, the hotel was chaotic with media and police. Even though *1263 Smolka is normally nondemonstrative, he now appeared confused, dazed, and distraught. At some point on this day, Smolka asked Delibero to make reservations for him at the Sand Key or Clearwater Radisson so he could get away from the commotion or perhaps go sailing.
Gary Weaver testified that he went to Ocala shortly after Betty Anne was reported missing. He stated that he searched for Betty Anne with Smolka but did not find her. On Friday, Weaver said that he and Smolka left the hotel; Smolka told Weaver that they were going to visit his sister in Tampa or St. Petersburg, but, when they left the Radisson, Smolka changed his mind about doing so. Weaver testified that Smolka lay down in the back seat and instructed him to drive to St. Augustine. After they were out of town, Smolka sat up. They arrived in St. Augustine around midnight Friday night. That night, Weaver rented a room at the Comfort Inn.
Justine Chasko also worked at the Radisson as an housekeeper. She testified that, on July 12, she was sent to pack away some of Betty Anne's things. At some point, Smolka entered the room and told her that she had inadvertently packed something that was his and not Betty Anne's; the item was his hair dryer. She agreed that Smolka was upset and appeared to be in a daze.

Saturday, July 13, 1994:
On Saturday night, Smolka and Weaver stayed at the Howard Johnson in St. Augustine until about midnight and then proceeded to Ormond Beach where they got another room for the evening. Weaver testified that Smolka was distraught, very curt and very quiet. He was tired and emotionally drained. Weaver said that during their travels, Smolka began crying and was physically weakened. At one point, Weaver used a false name on the hotel registration. Weaver testified that Smolka had talked to several attorneys during the last few days and they decided, with counsel's advice, that it would be okay to return to Virginia.

Sunday, July 14, 1994:
On Sunday morning, July 14, Smolka and Weaver left Ormond Beach and went to the office of an Ocala criminal defense attorney, Charles Holloman, where they met with Attorney Flanagan. By now, Flanagan was aware that Smolka was a suspect in the murder of Betty Anne. As they left that meeting, Flanagan got a call from his wife informing him that Betty Anne's body had been found in the grass near Quail Meadow Apartments, just off of Highway 27 in Marion County. Flanagan chased down Smolka and Weaver in their automobile and told Smolka the news.
Upon hearing that Betty Anne's body had been found, Smolka placed his head in his hands and began to sob. Flanagan said that Smolka appeared to be "worlds away" and was "sniveling." Because the hotel had been full of media personnel and the police, Flanagan recommended that Smolka wait across the street while Weaver gathered his luggage. Smolka agreed, and then specifically instructed Weaver to return with his briefcase and some cash. When Weaver returned with cash but no briefcase, because the police had already confiscated it, Smolka responded in anger by slamming his fist on the car dash and saying "damn!" This reaction struck Flanagan, and Flanagan testified that he began to question where Smolka's mind had really been, and he worried that he had involved himself in a compromising situation. One of the items Smolka expressed to Weaver that he wanted recovered from the Radisson was his return airline ticket so that he could exchange it for another flight to Virginia.
After Smolka and Weaver left Ocala, they went to Orlando, stayed the evening, and flew to Virginia Beach the next morning.

Physical Evidence Collected From the Crime Scenes:
Crime scene technician Linda Bower testified that she gathered evidence from the minivan and from Smolka's rented Corolla. In the van, she found blood from Betty Anne, several grass seeds in the door runners of the vehicle, and the supplies that Betty Anne had purchased at Phar-Mor. Betty Anne's purse was found inside the vehicle, but her wallet was never found. Bower was able to lift at least six latent prints off the interior and exterior of the van. She found no blood *1264 in the Corolla, nor did she find any grass seeds. The evidence showed that Betty Anne's body had been dragged into the field by her feet, thus causing her dress to rise up. Her underwear showed signs of being pulled down around one thigh. She was also missing her diamond ring.
Officer Petterson was involved in the search of Smolka's hotel room. He testified that he removed some vegetable matter from the cuffs of a pair of Smolka's pants found hanging in the closet. Petterson was also responsible for searching a Radisson office and seizing Smolka's briefcase. In the briefcase, he found the Smolkas' insurance policies.
Dr. Leal was the pathologist who performed the autopsy on Betty Anne. When he received the body it had already started to decompose, which distorted the external examination of the corpse. Dr. Leal's examination showed that Betty Anne died of a gunshot wound that traversed through her heart and lung. A second bullet also entered her body below the first and exited through her left arm.[2] The doctor did not believe that a person would have retained consciousness after either gunshot. He was able only to say that Betty Anne died sometime between Wednesday, July 10, at night and Friday, July 12, at night.
The doctor conducted tests for sexual assault on the victim, but because of the decomposition of the corpse, he had no way of telling whether the victim had been sexually assaulted before her death. Leal also acknowledged that he was never asked by the police or by the prosecutor to determine Betty Anne's time of death or to determine if Betty Anne had ever been sexually assaulted. Thus, the doctor stated that he never determined the contents of the victim's stomach, because he was never asked to do so. However, had he been informed of what the victim ate, when she ate it, and in what quantities, he could have narrowed down the time of death.
Emory Larson, the crime laboratory analyst who examined the latent fingerprints lifted from the Smolkas' rental vehicles, testified that the only fingerprint he received that he could match to Smolka came from Smolka's own rented Toyota Corolla. None of the various prints lifted from the minivan matched Smolka's.
Karen Barnes, a forensic serologist, testified that she examined swabs of semen found on the driver's side door or floorboard of the van. The semen stain did not match Smolka's blood type, but Barnes could not testify as to when the semen was placed in the van, nor could she say that it was not placed there on July 10. She also testified that she was not asked and, therefore, did not examine any of Betty Anne's clothing or belongings for the presence of semen. She testified that the clothing that she did analyze belonged to Smolka, and she found no traces of blood.
Paula Sauer, the microanalyst, testified that she did not match any of the fibers from Smolka to anything found on Betty Anne's clothing, underwear, or near the area where the body was discovered. She did not try to make any such comparisons, because with married couples, it is presumed that fibers from one spouse will be found on the person and possessions of the other spouse.
David Williams was a firearms identifications expert. He determined that the bullets retrieved from the van came from either a .38 special or a .357 Magnum. He was unable to find any gunpowder in Smolka's briefcase and could not determine if the weapon had ever been carried in it. He did not test Smolka's sportcoat to determine if any gunpowder residue was on it.
Sergeant Greg Graham of the Ocala Police Department testified about the location of Betty Anne's body and the crime scenes. Graham stated that it is 2.1 miles from the Radisson to the Phar-Mor, 2.9 miles from the Radisson to the Pizza Hut where the van was found, and 2.9 miles from the Radisson to the location where Betty Anne's body was found. Graham also testified that a grass seed was removed from the pants cuff on a pair of Smolka's trousers that were found in Smolka's room at the Radisson. That grass seed was eaten by a mouse while it was stored in the police evidence lockers.
*1265 Dr. Jerry Butler testified as a medical-veterinarian entomologist. Based on his examination of maggot larvae removed from Betty Anne's body, he estimated her time of death to be sometime after sunset, at 8:30 p.m., on July 10, and no later than 10 a.m. on July 11. He could not, however, rule out the possibility of her being killed before 8:30 p.m. He could not testify to how long her corpse was lying in the grass where it was eventually found. He was only able to determine approximately when flies had laid the eggs which developed into the maggots. He stated that the eggs could have been deposited within minutes of Betty Anne's death, but that the flies would not deposit their eggs during nighttime hours. The eggs are only laid during daylight hours but could have been deposited on the body in a car, a house, or almost any other closed quarters.
David Hall, a systematic botanist, testified regarding the grass seeds. He testified that the seed removed from Smolka's pantleg was a two to three week old Pensacola Bahia grass seed. He also said that Bahia seeds were found in the runner of the van, but these seeds were not necessarily "Pensacola Bahia." He then testified that, in September 1991, the field where Betty Anne's body was found contained both Pensacola Bahia and Centipede grasses, at maturity, with numerous seed heads. He also testified that there was Pensacola Bahia grass located on the Radisson property, but if the grass was mowed weekly, the seeds should not have reached the level of maturity of the seed found in Smolka's pants or of the seeds found in the van. He explained that Pensacola Bahia is one of the more common grasses found in this area of the state, and is not uncommon in the roughs of golf courses, near roadsides, streets, right-of-ways, or shopping areas. He could not testify that the seed removed from Smolka's pants came from where Betty Anne's body was found. He also could not say that it did not come from the Radisson. He did not test the Radisson lawn until late September 1991, and he could not say whether the Radisson grass was producing mature seed heads, such as the one found in Smolka's pant cuff, in July 1991. He could not say with certainty that the seeds found in the van came from the location of Betty Anne's body, either. The doctor could not identify any evidence obtained from Smolka's shoes to suggest he had been near the crime scenes.

Smolka's Conduct After leaving Ocala:
Kim McKimmey, Betty Anne's sister, testified that after Betty Anne's disappearance she told Smolka that, if he wished, she would put a stop on the stolen credit cards and checkbook. Smolka indicated that she could do "whatever she wanted" with the checking account, but that he would take care of the credit cards. The record suggests that Smolka never did anything with the credit cards. The testimony at trial also showed that the credit card and checkbook in Betty Anne's missing wallet showed no record activity after Betty Anne's disappearance.
Betty Anne's best friend, Joyce Fain, testified. She said that she had a conversation with Smolka, on July 15, after Smolka returned to Virginia Beach. She asked Smolka if he thought Betty Anne suffered very much. Smolka responded "a little bit." Fain testified that Smolka was very tired and upset. Nonetheless, she asked him who would do this to Betty Anne? He responded by shaking his head and saying "I don't understand. This isn't right." She later asked Smolka if he thought Betty Anne was murdered "right there in the parking lot, or [did he think] she was taken away somewhere and murdered?" Smolka said that he thought that it "probably happened right there in the area." She also testified that when she told him her volunteer Christian organization was trying to offer a reward for information on Betty Anne's murder, Smolka asked her "[d]on't you think they know everything?" When she told him that the Virginia Beach "press and people were really talking bad about him," he stated, "If they had anything, they would do something to me."
Finally, after Betty Anne's funeral, Smolka and Molly's baby-sitter discussed the fact that Betty Anne had missed her first flight to Ocala. Smolka lamented that there had ended up being no need for Betty Anne to come to Ocala, because Dalton was required to leave town prior to their business meeting.
*1266 When the State rested, Smolka moved for a directed verdict of acquittal. Smolka argued that because the State relied solely on circumstantial evidence, the evidence must be consistent with the defendant's guilt and inconsistent with any reasonable hypothesis of innocence. The trial court denied the motion. Smolka then presented his defense, consisting of several third-party witnesses.
Jennifer Lee, a waitress at the Pizza Hut, testified that she saw Smolka at the time the minivan was discovered. She said that he was approximately five to six feet from the vehicle, kneeling down and shaking his head. He was bending over as if to catch his breath. She said that the police were not there at the time.
Investigator Caruthers testified that he did not tell Smolka that he should not be concerned about fireworks affecting the results of the gunpowder residue test. Blaine Smith, another investigator with the Ocala Police Department, also remembered Smolka asking about fireworks affecting the gunpowder residue test, and he stated that he was unable to allay Smolka's concerns. Another officer testified he told Smolka that shooting off fireworks on the Fourth of July would not be a problem.
David Taylor testified for the defense that, after spraying the entire room at the Radisson with Luminol, they could find no trace of blood. He was not aware, at the time, that the room had already been cleaned by the hotel cleaning staff. Linda Bower testified that she found no blood, even with the use of Luminol, in the Cadillac Smolka borrowed from the Guidos.
Sergeant Graham testified that Smolka made numerous calls to criminal defense attorneys before he returned to Ocala from St. Augustine or Ormond Beach. He also testified that he recovered fireworks from Smolka's Virginia Beach home pursuant to a search warrant. His searches revealed that Smolka did not own a .38 or.357 caliber handgun.
The defense's forensic scientist, Stewart James testified. He approved of the techniques used by the police experts and stated that there was no evidence that Betty Anne's blood was transferred to Smolka or to any of Smolka's clothing. There was also no evidence that Smolka attempted to clean up any blood in his hotel room. No blood was found in Smolka's rental car, either. No fiber analysis was done to determine if fibers from Smolka were found in the van, because he and Betty Anne both used the vehicle before she was murdered. However, no bloody fibers were found in the van, the hotel room, the Toyota rental car, or on Smolka's clothing. He testified that the semen in the van could have been used to identify an assailant, but that no analysis was done of Betty Anne's underwear to determine if they contained semen. He testified that there was no physical evidence that placed Smolka in proximity to Betty Anne's murder or at the place of the subsequent dumping of her corpse.
As a rebuttal witness, the State called Detective Alford to the stand. He testified that he was in the police station when Smolka was being questioned. He testified that when Smolka got up and left the interrogation room and went to the bathroom, he followed him and stood just outside the bathroom door. He said the door was open about twelve inches and he saw Smolka wash his hands.
At the close of the State's rebuttal case, Smolka again moved for a directed verdict of acquittal. During argument, Smolka relied mainly on State v. Law, 559 So.2d 187 (Fla. 1989), and maintained that the State failed to present competent substantial circumstantial evidence to support their theory of guilt, nor was the evidence inconsistent with every reasonable hypothesis of innocence. In response, the State argued that the jury could have found that Smolka had no way of knowing there was blood in the middle seat of the van, had he not been present at Betty Anne's murder; that he attempted to remove gunshot residue from his hands when told he would have to take a gunshot residue test; that he was not at the Radisson when the murder occurred; that he showered after the murder occurred; that he had the motive and the opportunity to commit the murder; and that he attempted to disguise the motive of the murder to make it look like someone else had killed his wife. The lower court *1267 concluded that there was enough evidence to send the case to the jury.
Because a duly constituted jury found Smolka guilty of murder after hearing the evidence, we have tried to be thorough in our review of the evidence and cautious in our decision. Nevertheless, a special standard of review of the sufficiency of the evidence applies where a conviction is wholly based on circumstantial evidence. State v. Law, 559 So.2d 187, 188 (Fla. 1989); Jaramillo v. State, 417 So.2d 257 (Fla. 1982).
Florida law requires that when the state relies on circumstantial evidence to convict the accused, the state must prove the circumstantial evidence is consistent with the defendant's guilt and inconsistent with any reasonable hypotheses of innocence.
Riechmann v. State, 581 So.2d 133, 141 (Fla. 1991), cert. denied, ___ U.S. ___, 113 S.Ct. 405, 121 L.Ed.2d 331 (1992). As the Florida Supreme Court put it in Law, "[t]he State is not required to `rebut conclusively every possible variation' of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant's theory of events." 559 So.2d at 189 [footnote omitted]. That is the threshold that the State must meet  competent evidence which is inconsistent with the defendant's theory of events. Once the judge finds that the State has met that threshold, it is the jury's job to determine whether the defendant's reasonable hypothesis of innocence has been excluded by the evidence.
There is no doubt that the State's case against Smolka creates a strong suspicion that he murdered his wife. The number of suspicious circumstances is especially troubling. But suspicions cannot be the basis of a criminal conviction. Scott v. State, 581 So.2d 887, 893 (Fla. 1991). The sole fact that approaches the required test is Smolka's apparent guilty knowledge about where the blood stains were found in his wife's rented van, but given the surrounding circumstances, this fact is not persuasive of guilt. 581 So.2d at 893, Cox v. State, 555 So.2d 352 (Fla. 1989); Wilkes v. State, 541 So.2d 664 (Fla. 5th DCA), review denied, 547 So.2d 1211 (Fla. 1989).
Because we conclude that the evidence will not sustain Smolka's conviction, we need not reach the remaining issues properly raised on appeal.[3] We reverse the conviction and remand to the lower court with directions to enter an order of acquittal.
REVERSED and REMANDED with directions.
PETERSON, C.J. concurs.
THOMPSON, J., concurs, without participation at oral argument.
NOTES
[1] The State points out that the Smolkas had earlier appeared dressed for dinner; thus, presumably Smolka would have already had a shower.
[2] The State contended that Betty Anne was shot from the direction of the front passenger seat.
[3] Smolka has attempted to raise as an issue the lower court's refusal to permit the jury to consider certain additional evidence. A witness, Nancy Raymond, reported to the Ocala police, one day after Betty Anne's body was found, that she had seen a suspicious, predatory person, driving through the parking lot of the nearby Paddock Mall at the approximate time of Betty Anne's disappearance. She later identified the person through a photo-lineup as William Spencer. Spencer has a criminal history that includes sexual battery and kidnapping. Smolka claimed during a pretrial hearing on the State's motion in limine that Spencer had access to a white truck, owned by Robert Martin, fitting the description of the truck he was seen driving by Raymond, and that Martin was prepared to testify that Spencer was in Ocala on the day of Betty Anne's murder. According to a proffer made at the hearing, Martin would also testify he saw a woman's purse and clothing, as well as a bloody jumpsuit, in Spencer's car around the time of Betty Anne's murder. Finally, when Spencer and Martin were watching a news report of Betty Anne's murder, Spencer turned to Martin and said that no one could be sure that Smolka committed the murder, because "you don't know where I was that night." "It could have been me."

The lower court refused to allow the defense to present any of this evidence except Raymond's initial report of a suspicious person in the mall parking lot. Smolka elected not to call Raymond to testify at all, made no proffer of Martin's testimony during the trial and was untimely in presenting this issue on appeal.