WARNER, J.,
dissenting.
The facts of this case are obscured by the volume of the state’s presentation at the trial level. Despite their incoherence, I conclude that the state presented sufficient evidence to withstand a judgment of acquittal. Therefore I would affirm.
The salient facts to the motion for judgment of acquittal are these. Appellant and Annette came to this country from Guyana. Annette was married to Ramsammy’s brother and had a child with him. However, Annette left the brother and then accompanied Ramsammy to America. She continued to stay in routine contact with her son in Guyana as well as the rest of her family and friends there.
Ramsammy and Annette lived together and had a child, Ryan. As their relationship progressed, friends and family detected that Annette was unhappy, feeling trapped by Ramsammy who was a controlling person. Annette started an affair with a neighbor, Ronald Persaud. On January 11, 2000, Ramsammy found Ronald and took him for a ride in his van. Ram-sammy knew that Annette and Ronald were friends and Ramsammy wanted to know why Annette was so unhappy with him. During that conversation, Ronald told Ramsammy that he should not be so controlling of Annette. Ramsammy said that if Annette tried to leave him, “she will be terminated.” Ronald then told Ram-sammy that his relationship with Annette had become sexual. At that point, Ram-sammy became very, very angry. He threatened to kill Ronald and Annette. Ronald asked to be let out at his home, and Ramsammy complied with this request. A short time later, Ramsammy came over to the Persauds’ home to demand that the parents stop the affair. Ramsammy was very angry and in the presence of the parents threatened to kill both Ronald and Annette. He demanded that Gem Persaud call Annette to tell her to end the affair. Ramsammy told her to wait to call until he got home. Ramsammy then left the Persauds’ home.
When Gem called Annette, Annette was crying hysterically. Gem told Annette that she must end the affair. Gem then heard Ramsammy in the home, and Annette saying “you don’t understand.” Without objection, Gem testified that, “The phone was slammed down. Apparently he took the phone away and slammed it down because he didn’t want to continue the conversation.” Gem never talked to Annette again. Ramsammy also eventually admitted to the police that he had taken the phone away from Annette and had an altercation with her.
Around 5:30 the next morning, Ramsam-my called Raymond Persaud to tell him that he had been up all night long. He *111 told Raymond that Annette was pregnant, and he had sent her to Trinidad to have an abortion. Despite this, all of Annette’s papers, including her passport and green card, remained in the home.
On January 12th, Annette’s brother called about some property Ramsammy was selling in Guyana. When the brother asked to speak to his sister, Ramsammy told her that Annette was sleeping and refused to wake her.
During the months following Annette’s disappearance, Ramsammy made several inconsistent and false statements to friends and relatives about Annette’s whereabouts. He claimed that she just went out the door and never returned, that she left after a barbeque, that she ran away while he was teaching his son to ride a bike, that she went to Trinidad to have an abortion, and that she was a prostitute. He claimed he had heard from her, and she was contemplating suicide. Annette’s friends and family found that his stories about Annette’s disappearance were constantly changing.
In addition, Ramsammy harassed the Persauds. He called them relentlessly and threatened Ronald. The Persauds finally asked Ramsammy to stop calling. Sometime later, he told them that he had lied about sending Annette to Trinidad. He then told them that she took off her ring, simply walked out the door, and left all of her identification and wallet. He asked them to tell this to the police when they asked about her disappearance.
When Ramsammy finally did report her disappearance to the police some two months later, they first treated it as a missing persons report. In 2003 Detective Dara VanAntwerp took over the case and obtained a search warrant to inspect Ram-sammy’s van. During the search, Ram-sammy initiated a conversation with her. He admitted hitting Annette once at the beginning of their relationship, and again after he found out about the affair with Ronald. He asked VanAntwerp’s permission to simulate how he grabbed Annette on the night he discovered her affair, with Ronald. VanAntwerp consented, and Ramsammy first described how he argued with Annette. He placed his hands on VanAntwerp’s shoulders and shook her. VanAntwerp’s testimony continued:
But then his hands went up and around my neck, and when they were up and around my neck, he started to put me down on the ground and explain that she went down onto the ground of the living room, on the floor. At that time, I wasn’t comfortable with going to the ground. So I said, okay, that’s enough, and I stopped it. And he went on to explain that he put her down on the ground like that, and I backed away from him.
Q. Did he say anything to you after that?
A. He said, do you know how long it takes to kill somebody like that? And I said, no, I don’t. He said, a very, very long time.
After learning these details, Detective Va-nAntwerp presented the case to the prosecutor for review. Charges were not filed until 2006.
Contrary to the majority, I conclude that the foregoing facts, taken most favorably to the state, are sufficient to prove the corpus delicti of the crime and overcome a motion for judgment of acquittal. As the majority notes, “In order to prove corpus delicti in a homicide case, the state must establish: (1) the fact of death; (2) the criminal agency of another person as the cause thereof; and (3) the identity of the deceased person.” Meyers v. State, 704 So.2d 1368, 1369 (Fla.1997). The third *112 element is not in dispute, so I will address the first two.
Although Annette’s body was never discovered, the state can prove the fact of death by circumstantial evidence. See Crain v. State, 894 So.2d 59, 72 (Fla.2004); Meyers, 704 So.2d at 1369. Annette disappeared the night Ramsammy found out she was carrying on an affair with a neighborhood boy, threatened to kill her, and confronted her in a violent argument. Gem Persaud, her neighbor, testified that Annette was hysterical when speaking with her, and when Ramsammy came home, he slammed down the phone terminating the discussion. Ryan Ramsammy testified that his parents were having a big argument that night. Annette disappeared without any identification, all of which was left in her home. Although she maintained regular contact with family members, she has not been heard from since the date Ramsammy discovered her affair with Ronald. She abruptly left her small son and had no contact with her older son, whom she would contact regularly throughout the years.
All of this constitutes competent, substantial evidence to sustain the state’s burden of proving that Annette is dead. At least a jury could so find. It is far more than mere speculation. An abrupt disappearance can constitute strong circumstantial evidence of the fact of death. See Crain, 894 So.2d at 72; Meyers, 704 So.2d at 1370. Where a victim has frequent and regular contact with family which suddenly terminates without explanation, this too has been considered evidence that the victim is dead. See Sochor v. State, 619 So.2d 285, 289 (Fla.1993). Leaving all identification behind has also been evidence upon which the state can rely to prove the fact of death. Meyers, 704 So.2d at 1370; Sochor, 619 So.2d at 289. All of these factors are present in this case.
Ramsammy’s own statements also provide the necessary proof that Annette’s death was procured by the criminal act of another, namely himself. He admitted that he choked Annette and he began to show the detective just how he did it. He told her it takes “a very, very long time” to kill a person that way. He admitted perpetrating an act of violence on Annette which would have been substantially likely to cause her death.
The facts provide both motive and intent and the steps taken to effectuate that intent. Ramsammy threatened to kill Annette on January 11, 2000, because she had been unfaithful to him. He was extremely agitated. He admitted to having an altercation with her. He admitted choking her, and she was never heard from again.
At trial, the defense relied on Ryan Ramsammy’s testimony that he saw his mother alive the day after the altercation. While Ryan had given a statement to the police in 2003 or 2004, at trial he said he could not recollect either the statement or what happened, other than the fact that his parents were arguing on the night in question. The next day after he came home from school, he saw his mother, and then she disappeared. His testimony was impeached by another statement he made to one of his parents’ friends, Mr. Singh. Singh testified that Ryan told him that the last time he saw his mother was before he went to school that morning, and she was sleeping on the side of the bed. He never saw her again. Ryan was also interrupted in speaking with Singh by Ramsammy who yelled at Ryan that “they” would take Ryan away from him if he told that story. Ryan also testified that he wanted to be reunited with his father, because his life now with foster parents was not as good as his life with his father. Thus, Ryan’s testimony was both impeached and lacking in credibility because of bias. While it pro *113 vided evidence from which Ramsammy could argue against conviction, it does not negate the state’s evidence of guilt sufficient to withstand a motion for judgment of acquittal.
In my view this case is more like Sochor than Smolka v. State, 662 So.2d 1255 (Fla. 5th DCA 1995), relied upon by the majority. In Sochor the victim’s body was never recovered. However, Sochor’s brother testified that the last time he saw the victim, Sochor was assaulting her and she was screaming for help. Our supreme court held that the evidence was sufficient to prove the corpus delicti of the crime. Similarly, in this case Gem Persaud and Ryan Ramsammy both testified to the altercation that night between Annette and Ramsammy, which Ramsammy himself admitted perpetrating. Gem could hear Annette’s hysterical cries over the phone. No one heard from Annette after that phone call. Just as in Sochor, the evidence was sufficient to establish the fact of death by the criminal act of Ramsammy.
Because I conclude that the state presented sufficient evidence to withstand a motion for judgment of acquittal, the issue of guilt was properly submitted to the jury. I would affirm.